## ST. PAUL FIRE & MARINE INS. CO. v. CULWELL et al.
### No. 1694—6205.

Commission of Appeals of Texas, Section A.
June 24, 1933.

Cox & Hayden, of Abilene, for plaintiff in error.

Smith & Smith, of Anson, for defendants in error.

CRITZ, Judge.

The St. Paul Fire & Marine Insurance Company issued to H. E. Culwell two policies of fire insurance, one in part on a stock of goods of a drug store, and in part on certain drug store furniture and fixtures in the town of Avoca, Tex. The other policy is on the stock of goods of the same store. There is no issue of concurrent insurance involved. The property covered by the two policies was destroyed by fire while they were in force, and the refusal of the insurance companies to pay brought on this litigation.

The suit was instituted in the district court of Jones county, Tex., by Mrs. A. E. Culwell, wife of the named insured, joined pro forma by her said husband, to reform the two policies so as to make them read to "Avoca Drug Company," and recover the amounts thereof in her own right as her separate property. Trial in the district court without a jury resulted in a judgment for Mrs. Culwell. This judgment was affirmed by the Court of Civil Appeals. 45 S.W.(2d) 347. The insurance company brings error.

The facts of this case are undisputed; only law questions being involved. It seems that during the happening of the events here involved, and for many years prior thereto, there was a drug store in Avoca, Tex., run in the trade-name of "Avoca Drug Company." During such period the above store was owned and operated by various parties. At one time it was owned by the son of these two

plaintiffs. At the time the two fire insurance policies here sued on were issued, and at the time the property insured burned, the store in question belonged to Mrs. A. E. Culwell, wife of H. E. Culwell, in her separate right. H. E. Culwell acted as general manager for his wife in the operation of the store. Mrs. Culwell seems to have stayed at home and attended to her household duties in the ordinary manner of a housewife. It is shown that all of the property covered by these two policies was destroyed by fire during the life of such policies, except a small amount of goods in a safe. Mrs. Culwell demanded payment of the policies as the sole owner. The company refused payment on the ground that the contract was personal to H. E. Culwell, and did not protect Mrs. Culwell. The suit followed.

As above shown, both of these policies are issued in the name of H. E. Culwell as the owner of the property insured. Both such policies contained the following standard provision: "This entire policy unless otherwise provided, by agreement, endorsed hereon or added hereto, shall be void * * * if the interest of the insured in the property be other than unconditional and sole ownership. * * *"

Neither of the above policies contains any agreement indorsed thereon or added thereto which in any way modifies or abrogates the above provision.

As already shown, and as shown by the opinion of the Court of Civil Appeals, Mrs. Culwell seeks to recover on these two policies in her own name, and in her separate right as the unconditional and sole owner of the properties insured. In this connection Mrs. Culwell seeks to reform the policies so as to make them read to the trade-name of "Avoca Drug Company," and then seeks to recover as the sole owner of such Avoca Drug Company; in other words, Mrs. A. E. Culwell seeks to recover on the theory that she and Avoca Drug Company are one and the same person, and that the parties to the contract both intended for Avoca Drug Company to be named therein as the insured, regardless of ownership. The ground relied on by Mrs. Culwell to so reform the policies is mutual mistake in making such policies read in the name of her husband, H. E. Culwell.

█ It is the settled law of this state that the above ownership clause in a fire insurance policy has no relation to any answer or statement covered by the provisions of article 5043, R. C. S. 1925, but such ownership clause is a contractual warranty. It is also the settled law that fire insurance policies are purely personal contracts available only to the holder or insured. It follows that they are not contracts in rem. National Fire Insurance Co. v. Carter (Tex. Com. App.) 257 S. W. 531.

█ Since fire insurance contracts are personal to the insured it follows that fire insurance companies have the right to consider the person insured, the moral hazard, as of prime importance in issuing their policies. In fact, the person insured is always a matter of prime consideration in issuing fire insurance policies. National Fire Insurance Co. v. Carter, supra.

In the case at bar it is fairly evident that this company might have been willing to assume this fire risk if the business insured was owned and operated by the husband, when it would not have been willing to assume such risk if the business was owned by the wife, and operated by the husband as her agent.

Since these policies were issued to H. E. Culwell, and as written are personal to him, Mrs. A. E. Culwell cannot recover in this suit in her own separate right, unless and until such policies are reformed so as to make them in some way legally personal to her. Mrs. Culwell contends that this can be accomplished if the policies are reformed so as to make them read to "Avoca Drug Company." As already stated, the ground alleged for reformation is mutual mistake.

█ A mutual mistake is one common to both parties to the contract, each laboring under the same misconception. Harrell v. De Normandie, 26 Tex. 120; May v. San Antonio, etc., Town Site Co., 83 Tex. 502, 18 S. W. 959; 5 Words and Phrases, Third Series, 297; Paine-Fishburn Granite Co. v. Reynoldson, 115 Neb. 520, 213 N. W. 750.

Stated in another form, a mutual mistake is one which is reciprocal and common to both parties to the contract, and one where each alike labors under the same misconception, in respect to the terms of such contract, and sometimes of the agreement itself. Id.; O'Reilly's Case, 258 Mass. 205, 154 N. E. 851.

█ Equity has jurisdiction to reform written instruments in cases of mutual mistake, but a written contract will not be reformed in equity because of a mistake, in the absence of fraud, unless it is mutual; that is, common to both parties, and each under the same mistake as to its terms. May v. San Antonio, etc., Town Site Co., supra; Finks v. Hollis, 38 Tex. Civ. App. 23, 85 S. W. 463; 5 Words and Phrases, Third Series, 298; Universal Sec. Co. v. American Pipe & Const. Co., 95 N. J. Eq. 752, 128 A. 618.

█ Under our blended system of law and equity, an instrument can be reformed, and recovery had on such instrument as reformed in one action.

█ We shall now proceed to apply the above rules to the facts of this case to ascertain if there are any facts which will justify reformation of these two policies so as to make them personal to Mrs. A. E. Culwell in

her own separate right. It is evident, from the statement we have made and the evidence we shall later quote, that to justify such reformation we must find evidence in the record which will either support a finding that both the insurer and the insured intended the policies should read in favor of "Avoca Drug Company," regardless of ownership, or that it was intended by both the insurer and the insured that such policies should read to Mrs. A. E. Culwell in her very name.

The transactions involved in the issuance of these policies all took place between H. E. Culwell, the husband, and G. H. Rennels, the local agent of the insurance company. As we understand this record, the testimony of these two witnesses contains all the evidence bearing on the issue of mutual mistake. Both of these witnesses were offered by Mrs. Culwell.

H. E. Culwell's entire testimony is as follows:

"My name is H. E. Culwell. I live at Avoca, Texas. Avoca is in Jones County, Texas. I have lived there about twenty-eight or thirty years. During that entire time, I have been engaged in the mercantile business, working in the drug department of the mercantile business.

"I took out those two policies that have been introduced in evidence here, with the Saint Paul Fire & Marine Insurance Company; one dated March 3rd, 1930, for $1,000.00, and one dated October 1st, 1930, for $1,500.00. I took them out on the drug fixtures and drugs, the entire stock of drugs and drug fixtures. I took them out on the dates as shown on the policies. I took them out with Mr. G. H. Rennels, the local agent of the Saint Paul Fire & Marine.

"Prior to that time, I had known Mr. Rennels for thirty years, I guess, right around thirty years. He had been living there at Avoca during that time. Prior to the time of taking out these two policies, I had taken other policies out with the same Mr. Rennels. The other policies were always written in the name of the Avoca Drug Company.

"At the date of the taking out of these policies, A. E. Culwell was the owner of the Avoca Drug Company. When I had other insurance transactions with Mr. Rennels, I don't remember just who it was that was the owner of the Avoca Drug Company, the last policy that I took out before this—whether it was A. E. Culwell or Ira Culwell—I don't remember. As well as I remember, it was about four years ago that I took the last ones out, before this one.

"Since you have refreshed my memory, I will state that at that time, when I took out the last policies, A. E. Culwell, was the owner of the Avoca Drug Company.

"When these policies were written, I told Mr. Rennels I wanted some insurance for the Avoca Drug Company. As to when he delivered the policies to me, with reference to when I told him about it, I don't know whether they were delivered the same day they were written or the next day. If they wasn't, they were delivered the next day.

"When I went to sign the Proof of Loss is when I found out that the policies were not in the name of the Avoca Drug Company. As to how long after the fire that was, Judge, I just don't remember when the last Proof of Loss came.

"The property burned the 14th of October. As well as I remember, the adjuster came about five days after the burning. That was not the day that I saw the policies and discovered it for the first time; it was later, when I went to sign the other Proof of Loss. I had the policies there that day; they were there.

"A. E. Culwell is my wife. I have had charge of running the drug store. At the time those policies were written, my wife was the owner. I was in charge of the store; I was manager.

"Mr. Rennels has been engaged in writing fire insurance at Avoca for several years; I don't know just how long, but he has been writing for the Saint Paul Fire and Marine for several years.

"There wasn't anything at all saved there out of the fire; absolutely nothing.

"I had a conversation with Mr. Rennels, the agent, after the fire and before the adjuster got there. Mr. Rennels knew about the fire; he was there at the fire.

"About five days after the fire, the adjuster came. The adjuster's name was Mr. Heyde. That is the gentleman who is sitting right there at the table. When Mr. Heyde came, Mr. Rennels was not present.

"When Mr. Heyde came, what he did relative to the fire was, he sat down and figured up the loss, and told me that he could readily see it was a total loss, and said he wanted to settle right away; said the quicker we can settle, the better it is. He had my policies in his possession that day.

"There was an agreement made between Mr. Heyde and myself that day. He agreed to pay $2457.00 and some few cents, and asked me if it was perfectly satisfactory, if that settlement would be satisfactory, and I told him it would at that time; I would settle that way just at that time.

"The policies called for $2,500.00 and I can explain why he and I agreed upon a lesser amount than the $2,500.00. He was taking off some for deterioration; I don't know why; he done the figuring; said he was knocking that much off for deterioration. My safe had not been opened at that time; it was hot.

"I had some things in the safe that was calculated to go with the stock. I had some old ledgers and some narcotics, drugs. There was some deduction to be made for the narcotics; he taken off $25.00—we agreed that he would take off $25.00 for that.

"Mr. Heyde told me I would be settled with right away; he told me the checks would come right away. He then gave me some instructions about how to manage the checks. He told me to pin each one of the policies to a separate check, and to put it in the bank. That's what he told me to do. They did not send the checks according to that; they never sent no checks.

"At that time, I was called upon to sign something. Mr. Heyde called upon me to sign a proof of loss. They were not filled out at that time. There was nothing said to me by Mr. Heyde about what would be put in them; nothing at all; it wasn't mentioned. My signature was witnessed to that proof.

"I found out what was put in them, the day that he was in your office over here. I really don't know just how many days that was after he came to my place to view the fire. I found out what was placed in those proofs of loss by reading them.

"Mr. Heyde did not bring those proofs back to me; he brought another set, that is, he mailed them to me. This other set had $2,275.00 in it. That was not according to the agreement that I had with him out there, at all. I think I have seen the first set that I signed up in blank, since the time that I signed them. I really don't know just how much was in the blanks. I don't think they were for the $2457.00; I don't think they were filled out for that amount.

"When he mailed me some additional blanks for the $2,275.00, I did not sign them up for that amount. I made some changes in them before I signed them; there were changes made in them before we signed them. $2500.00 was the amount that was put in there, I think, as well as I remember.

"At that time, my wife and I both signed them. The first ones that I signed in blank, my wife did not sign them.

"On the day that I signed those up in blank, there was nothing at all said between Mr. Heyde and myself about who the owners of that stock of goods were.

"The Company has declined to pay me the $2,500.00; they have declined to pay the $2,457.00. They communicated their refusal to me through a letter to Mr. Rennels, first. I saw that letter. I don't have the letter. Mr. Rennels had the letter when I saw it. The letter was from Mr. Heyde.

"After they refused to settle, Mr. Heyde and I had a conversation about it. He hunted me up at Stamford and told me— I don't remember—he said something about I had played thunder to turn it over to an attorney for collection. That was before suit was filed. That was after he was out there the first time and made the adjustment.

"That was not all he said to me about it. He asked me if I could come to Anson. I told him I could if we would get some papers fixed up. I came, and Mr. Heyde came, but I was by myself in my car, and he was in his. He and I fixed up some papers. They were affidavits made by Mr. Rennels, and they were pertaining to the settlement.

"I don't know what became of the original affidavit. Mr. Heyde had the affidavit that day; he had one. I think I know where the original affidavit is that Mr. Heyde got that day; I think I have it. Oh, I don't remember who got the original; there was a copy made, but I don't remember who got the original.

"Mr. Heyde dictated the affidavit, and I signed it and Mr. Glenn Rennels signed it. That is the G. H. Rennels that wrote the policies.

"Examination by the Court.

"When Mr. Heyde and I were together down there at the first meeting at Avoca, he told me how much he would pay me. He said he would pay me $2457.00 and some few cents. In answer to that, I told him I would settle that way, if he would settle immediately. He asked me if it would be satisfactory, and I told him it would. In answer to that, he said the checks would be sent to correspond to the policies and for me to pin each check to the corresponding policy and deposit them in the bank. As to when that was to be done, he just said it ought to be right away.

"Cross-Examination by Mr. Cox.

"Mr. Heyde did not give me any check himself. Nor did he give me any draft. He told me that he was just the adjuster. But he did not tell me that he had no authority to pay claims. He did not tell me his only duty was to go out and investigate the fire; he didn't say anything about that. He did not tell me at all, that he had to get the proof of loss filled out, send it to the General Agent and make his recommendations. Anyway, he did not pay me.

"When he found out that I had turned it over to an attorney for collection, he said I had played 'thunder' or something to that effect. He did not tell me when I got into court that I wouldn't get the money. He said it would possibly be two years before I got the money.

"The conversation in which I claim that he told me he would pay me the $2,457.00 was on the first occasion that he was out there, and that was on the occasion that I signed the

proof of loss; that was the time when I signed that one in blank.

"At that time, I had the policies there. During the fire, my wife had the policies at home in a buffet drawer. I did not have them in a safe, because my safe had been broken open several times and my papers destroyed. I carried them out home for safe keeping. The buffet wasn't fire-proof, and the safe wasn't either, the way it burned up. Anyway, I had the policies at home.

"On this first visit that Mr. Heyde made there, I had the policies there when I was going over the proposition with him. That's those policies that have been offered in evidence here. I didn't know it at the time, but they are both written to me.

"I did not say anything to Mr. Heyde at that time about the ownership of that property—there wasn't anything said about it. I don't know as he went ahead and dealt with me on these policies the way they were written. That is the only interest he had; he agreed to settle on the amount of the policies.

"The policies showed me, H. E. Culwell, as the owner; they were made to me. I did not tell Mr. Heyde on that occasion that my wife owned the property; he didn't ask me. I would have told him. The policies don't disclose that she was the owner.

"I said while ago, that four years before these policies were written, that I had taken out some other insurance with Mr. Rennels, and that's right. In other words, he had not written any policies on this particular stock for about four years, or something like that —I don't remember exactly—until these policies were written.

"I don't know whether those that were written four years ago, were written in the Saint Paul Fire & Marine Company or not; but they were all written in the Avoca Drug Company name. I am not sure whether or not they were written in the Saint Paul; I was under that impression, but I am not positive that they were in the Saint Paul. That's the last policies that he had written for me, somewheres about four years ago, I don't remember exactly, but about four years before these were written.

"One of these policies here was written on the 3rd of March, 1930, and that's for $1,000.00 and is a policy on the stock, and the other one was written on the 1st day of October, 1930, and is for $1,500.00 on the fixtures and some stock; as well as I remember, it was something like four years before that, that Mr. Reynolds did the last insurance work that he did for me.

"I said the policies that he wrote for me four years before, were written in the name of the Avoca Drug Company. I know my brother did not own the store at that time.

"I had a lawsuit about five years ago, the Brenard Manufacturing Company sued me and sued my brothers; I came in and answered, and went to the bat with them on the case; I never said anything else about it at that time. I did not own it at the time I had that suit. I really could not tell you who really did own it at that time; I think J. N. Culwell did; that was my brother.

"At that time, the insurance was written in the name of the Avoca Drug Company; it had always been written that way.

"My wife got it from my son. My son's name is Ira Culwell. I think my wife acquired it about four years ago. She has owned it since about four years ago; that's my recollection about it. Prior to that time, it was owned either by my brother or my son. As to my having an interest in it, too, when this suit was filed, I will say I never have owned the drug store myself. I am not sure whether I testified in that suit that my brother and I owned it; I don't think I did. I got a commission for operating it, I was working at it, running it.

"I don't remember whether or not I filed any pleadings here to the effect that I didn't own it or own any interest in it. My brother J. N. and I both testified in the trial of that case that no salary was to be paid to me, H. E. Culwell. But as to my having an interest in the business and my sharing profits in the business, I will say I had an interest, yes, just a working interest.

"I never did dispose of that working interest.

"My son bought it from J. N. Culwell, is the way he came to own it. As to whether it is true, as stated in the petition, that it belongs to my wife and is her separate property and I have got no interest in it, I will say I just had a working interest; I don't own any of the stock of the store at all. It belonged solely to my wife, A. E. Culwell, and did when these last policies were written. But I don't think it did back when the others were written, four years ago. I don't remember just the date, but I don't think she owned it then; those records, the book records, will show.

"When I made the remark to Mr. Rennels that I wanted some insurance, I told him I wanted some insurance for the Drug Company. I didn't tell him who the drug company was; he didn't ask me; there wasn't nothing said about that at all. He didn't ask me and I thought he would just make it to the company.

"I was in there running it, in the drug store, and my wife was at home, running the home. Mr. Rennels issued those policies and brought them to me and delivered them to me. I paid him for them. I carried them home and gave them to my wife, and she put them in the buffet. I did not pay any attention to who they were written to, at all. I never

told Mr. Rennels that the Avoca Drug Company was Mrs. A. E. Culwell until after the fire; wasn't nothing said about it.

"I rendered it for taxes; I had always rendered it before. I didn't say anything in the rendition about A. E. Culwell being the owner. I always rendered it as the Avoca Drug Company; it has always been rendered that way.

"I think I gave a mortgage to the Southwestern Drug Company, of Waco, on the soda fountain, fixtures and furniture in this store, in October, after these last policies were written. I think I signed that mortgage Avoca Drug Company by H. E. Culwell. I don't know whether there was any 'By' in it or not, but it was Avoca Drug Company— H. E. Culwell. That's the way all checks were signed.

"That mortgage was to secure a note for a debt that the Avoca Drug Company owed. The note was signed the same way—'Avoca Drug Company. H. E. Culwell.' I did not tell the Southwestern Drug Company that my wife owned it—they never did ask me anything about it. That debt has not been paid. It is still outstanding as a lien; it has not been paid.

"My wife and I both signed the proof of loss you have there, and swore to it before A. J. Smith, Jr., a Notary Public, on the 26th day of November, 1930."

Later on being recalled Culwell testified as follows:

"Since I have been on the witness stand, I have had occasion to refresh my memory as to when my wife acquired title to that property. I think it was in September, 1926, that she acquired title to it, best I can remember."

Mr. G. H. Rennels' entire testimony is as follows:

"My name is G. H. Rennels. I live at Avoca, Texas. I am a rural mail carrier; in addition to that I have another side line of work—I write insurance. I have lived in the town of Avoca for twenty years. I have been writing insurance there for about twelve years.

"I think I, as agent, have been writing insurance upon the drug store over there about eight years, I have been writing insurance on that place, during that time, in the name of Avoca Drug Company up until the last two policies, these two, that is, now. I wrote those two policies that you have there.

"I cannot explain why I wrote those different to what I did the others, nothing only I just thought Mr. Culwell was the owner of the Avoca Drug Company, and I didn't think it would make any difference the way it was written, and I just wrote it 'H. E. Culwell.' I had no conversation to the contrary with anyone.

"When these two policies were written, there was no written application made for them. I did not require written applications in the former policies.

"I have known Mr. H. E. Culwell about thirty years.

"Cross Examination by Mr. Cox.

"The former policies that I wrote on the Avoca Drug Company, I did not know then that Mrs. Culwell was the owner, if she was the owner of the Avoca Drug Company. When I wrote these policies, I said I didn't know whether she was the owner—I did not know that she was the owner; that's correct. I thought H. E. Culwell was the owner, and I did not find out anything to the contrary until after the fire. In other words, until after the fire occurred, I still thought H. E. Culwell was the owner of that business there. If I had not thought that, I would not have written the policies in that name.

"A day or two after the fire, I got a letter similar to that one you have there, the best I can remember.

"When I wrote those policies, I made what is called a daily report, and I sent that in to the General Agents. The General Agents in this instance, were Cravens, Dargan & Company, at Houston, and that is where I sent the daily report. The daily report showed just what the policies showed—it was a copy of them. It showed the property that I was insuring and showed H. E. Culwell as the owner. That is what I mailed in to the General Agents at Houston.

"I had no communication whatever with the Saint Paul Fire & Marine Insurance Company, but my negotiations were all with Cravens, Dargan & Company, at Houston, the General Agents.

"When they instructed me to cancel those policies, Mr. Heyde said it was too late, and I did not do it, because I got those instructions after the fire. The reason I did not cancel the two policies was because the property had already burned. That letter is dated the 15th of October. The fire occurred on the 15th, and I didn't get that letter through the mails until two or three days after the fire.

"I said something to Mr. Culwell about my getting that letter. I told him that I had gotten a letter with instructions to cancel the policies. I told him my instructions came too late. I showed him the letter, and told him the letter came too late.

"Neither Mr. Culwell nor Mrs. Culwell nor anybody ever reported to me at any time before this fire occurred, that a mortgage had been given to the Southwestern Drug Corporation, of Waco, on the fixtures in this store. I did not put a 'Loss Payable Clause' on the policies; I didn't know anything at all about it.

"I was present the first time that Mr. Heyde came out there, when this loss was discussed the first time, a few days after the fire. I wasn't with Mr. Culwell, but I was right around there and I saw Mr. Heyde. I wasn't present when Mr. Heyde and Mr. Culwell had their conversation.

"Re-Direct Examination by Mr. Smith.

"I had a conversation with Mr. Heyde that day. As to what he said about paying for the loss, Mr. Heyde said he didn't see how they could keep from paying it. They didn't write this letter until after the fire occurred; that he answer this letter himself, and I need not answer it.

"After the fire and before Mr. Heyde got there, I did not communicate with Mr. Heyde; I notified the Company. I notified them at Houston; Cravens, Dargan & Company. They are the State Agents for the Saint Paul Fire & Marine Insurance Company, and I have had all of my dealings, as local agent, with them.

"I was acquainted with Mr. Heyde before he came out there; I had seen him once before in another adjustment. He had been in the capacity as adjuster.

"My conversations with him out there that day, were in the capacity of an adjuster.

"Re-Cross Examination by Mr. Cox.

"When I had this conversation with Mr. Heyde, in which he told me the letter came too late and he did not see how the Company could keep from paying the loss, so far as I know, I don't know whether he knew about this mortgage or not. I don't know about that; I had not told him. There was no discussion between us about it.

"So far as I know, he did not know that Mrs. A. E. Culwell was the owner of the property. I did not discuss that with him, not at that time.

"Re-Direct Examination by Mr. Smith.

"I did discuss that with him when he came back another time. He has been there three times, I think, I wouldn't say for sure whether it was the second or third time, but he told me he had found out the business was in Mrs. A. E. Culwell's name. I told him I didn't think so, at that time. I had to go over, when I found out different.

"I do not know if that was the day that they all came to your office and made some affidavits, Mr. Smith. I did not come.

". "Re-Cross Examination by Mr. Cox.

"That could possibly have been the last time Mr. Heyde was there, when he did make the second proof, I would not say for sure. I think he was there three times. He did not tell me that Culwell had told him that his wife was the owner. He did not say where he had found out his information."

We have carefully read and considered the above testimony, and in our opinion it is utterly insufficient in law to justify a fact finding that this insurance company made a mistake in issuing these policies to H. E. Culwell; in other words, we think that the testimony of these two witnesses fails absolutely to contain any evidence showing, or tending to show, that it was mutually intended at the time these policies were written or delivered that they should read in favor of "Avoca Drug Company," regardless of ownership, or that they should read to Mrs. A. E. Culwell in her very name.

It appears in the answer of the insurance company that they tendered back the premiums paid on these policies. It is not pointed out to us that the record shows that such premiums were actually paid into court.

We recommend that the judgments of the Court of Civil Appeals and district court be both reversed as to the recovery allowed against the insurance company on the policies for the loss of the properties insured, and that judgment in that respect be here rendered for the insurance company. We further recommend that judgment be here rendered for Mrs. Culwell for the amount paid as premiums on the two policies here sued on, $39.-75.

We further recommend that the insurance company be required to pay all costs in the district court, and that Mrs. Culwell be required to pay all costs in the Court of Civil Appeals, and in the Supreme Court.

CURETON, Chief Justice.

The judgments of the district court and Court of Civil Appeals are both reversed, and judgment rendered for the plaintiff in error, as recommended by the Commission of Appeals.