**GILBANE BUILDING COMPANY and Zurich American Insurance Company, Appellants,**

**v.**

**KEYSTONE STRUCTURAL CONCRETE, LTD., Appellee.**

No. 01–05–00988–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 26, 2007.

Carol Patricia Keough, Todd M. Lonergan, Coats, Rose, Yale, Ryman, & Lee, P.C., Houston, TX, for Appellant.

Ellen L. Van Meir, Jacquelyn Chandler, John Sepehri, Thompson, Coe, Cousins & Irons, LLP, Dallas, TX, for Appellee.

Panel consists of Justices NUCHIA, KEYES, and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

Appellants, Gilbane Building Company and Zurich American Insurance Company

(collectively "Gilbane" or "appellants") appeal the trial court's order that granted summary judgment in favor of appellee, Keystone Structural Concrete LTD. ("Keystone"). In five issues on appeal, appellants assert that the trial court (1) incorrectly granted Keystone's summary judgment on its contractual indemnity claim; (2) incorrectly granted Keystone's summary judgment on Gilbane's breach of contract claims; (3) improperly refused to reform the contract between Gilbane and Keystone; and (4) improperly granted summary judgment on Gilbane's claim that Keystone failed in its duty to advise Gilbane of the existence of another insurance policy. Alternatively, Gilbane argues that the trial court improperly granted summary judgment based on ripeness instead of abating the claim, allowing an amendment of the claim, or dismissing the claim without prejudice.

We affirm.

## Background

Gilbane and Keystone contracted for Keystone to act as a subcontractor on a construction project that Gilbane was performing at Rice University. During construction, Victor Nava, an employee of Keystone, suffered an injury and brought suit alleging negligence against Gilbane only.[1] Nava settled his suit for $2,000,000 of which Admiral Insurance, Keystone's primary carrier, paid the first million.[2] Gilbane's primary insurance carrier, Zu-rich, paid the second million of the settlement.[3]

After Nava's settlement was funded, Gilbane filed suit against Keystone and Royal Insurance Company of America ("Royal Insurance"), Keystone's excess carrier, seeking to recover the million dollars it paid to settle Nava's claim.[4] In its third amended petition, and pertinent to this appeal, Gilbane asserted that Keystone was liable for (1) breaching a contractual indemnity agreement in the Gilbane–Keystone contract; (2) breaching the contractual provision that required Keystone to provide insurance coverage of up to $6 million that would be primary to any coverage issued to Gilbane for any loss arising out of Keystone's performance of the work under the contract; and (3) breaching the contractual requirement that Keystone verify that all construction equipment used was in a safe condition and that the work was performed in compliance with the applicable safety rules, regulations, codes, ordinances and statutes. Gilbane also sought reformation of its contract with Keystone if the trial court did not agree that the contract expressed a specific intent that Keystone provide Gilbane with liability coverage for negligence; and Gilbane contended that it was damaged when Keystone failed to timely inform it that Northern Insurance Company ("Northern Insurance") had issued a policy to Key-

---

1. Section 408.001 of the Texas Labor Code precluded Nava from bringing suit against his employer, Keystone. *See* Tex. Lab.Code Ann. § 408.001 (Vernon 2006) (providing that "workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage ... against the employer ... for the death of or a work-related injury sustained by the employee"). The parties do not dispute that Keystone provided workers' compensation benefits to Nava.

2. Admiral Insurance provided a defense to Gilbane.

3. Gilbane had to pay a $250,000 deductible.

4. On February 18, 2005, the trial court granted Gilbane's and Zurich's Motion for Dismissal of Royal Insurance Company of America without prejudice. Thus, Royal Insurance is not a party to this appeal.

stone that would have covered Nava's claim.

Keystone filed a motion for partial summary judgment and a no-evidence motion for partial summary judgment. Gilbane filed a response. On July 18, 2005, the trial court granted summary judgment to Keystone as to all the allegations against Keystone asserted by Gilbane. Gilbane filed a motion for new trial or in the alternative a motion to modify judgment. The motion for new trial was overruled by operation of law.

## Analysis

In its first issue on appeal, Gilbane argues that the trial court incorrectly granted Keystone's summary judgment on the contractual indemnity claim asserted by Gilbane.

**Standard of Review**

Summary judgment is a question of law. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 220 (Tex.2003). Thus, we review a trial court's summary judgment decision de novo. *Id.* at 215. The standard of review for a traditional summary judgment motion is threefold: (1) the movant must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed, material fact issue precluding summary judgment, the court must take evidence favorable to the nonmovant as true; and (3) the court must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in the nonmovant's favor. Tex.R. Civ. P. 166a(c); *Pustejovsky v. Rapid–Am. Corp.,* 35 S.W.3d 643, 645–46 (Tex.2000); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). A defendant seeking summary judgment must, as a matter of law, negate at least one element of each of the plaintiff's theories of recovery or plead and prove each

element of an affirmative defense. *Missouri Pac. R.R. v. Lely Dev. Corp.,* 86 S.W.3d 787, 790 (Tex.App.-Austin 2002, pet. dism'd).

A party moving for no-evidence summary judgment must assert only that there is no evidence of one or more essential elements of a claim or defense on which the non-movant would have the burden of proof at trial. *See* Tex.R. Civ. P. 166a(i). The burden then shifts to the non-movant to produce evidence raising a fact issue on the challenged elements. *See id.* A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.; Forbes Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 172 (Tex.2003). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Forbes,* 124 S.W.3d at 172. More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *Id.* As with a traditional summary judgment, we view the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003).

If the trial court has granted summary judgment without specifying the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced is meritorious. *See State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993).

**Indemnity**

 In its first issue on appeal, Gilbane argues that the "trial court incorrectly granted Keystone's summary judgment on the contractual indemnity claim asserted by Gilbane." Gilbane relies on the con-

tractual indemnity provision found in the Gilbane–Keystone contract, which states,

5.2 For ten ($10.00) dollars and other good and valuable consideration, the receipt whereof is hereby acknowledged, and to the fullest extent permitted by law, the Trade Contractor (**Keystone**) **agrees to indemnify and hold harmless, [Gilbane]**, the Owner, the Architect/Engineer and all of their agents and employees **from and against claims**, damages, losses and expenses, including but not limited to attorneys' fees **arising out of or resulting from the performance or failure in performance of [Keystone's] work under this Agreement provided that any such claim, damage, loss, or expense (1) is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom, (2) is caused, in whole or in part, by any negligent act or omission of [Keystone] or anyone directly or indirectly employed by [Keystone], or anyone for whose acts [Keystone] may be liable, regardless of whether caused in part by a party indemnified hereunder.** Such obligations shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this paragraph. In any and all claims against the Construction Manager (Gilbane), or any of its agents or employees, by any employee of [Keystone], or anyone directly or indirectly employed by [Keystone], or anyone for whose acts he may be liable, the indemnification obligation under this paragraph 5.2 shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for [Keystone] under worker's compensation acts, disability benefit acts, or other employee benefit acts.

Gilbane argues that this provision "clearly expresses the agreement of the parties that Keystone will indemnify Gilbane when Gilbane is subjected to a claim that arose in whole or part by any negligent act or omission of Keystone which was committed during the performance of Keystone's work under the contract." Gilbane recognizes that the authorities cited by Keystone preclude Gilbane from recovering for its own negligence, but it argues that the authorities do not address the situation in which Gilbane is "able to establish that the incident involving Mr. Nava and the resulting loss suffered by Gilbane was caused by the negligence of Keystone in whole or part and not the negligence of Gilbane." Keystone responds that the contractual indemnity provision is not enforceable because Gilbane was sued for its own negligence, the indemnity provision does not expressly indemnify Gilbane for its own negligence, and therefore, it does not comply with the express negligence test mandated by Texas law. We agree with Keystone.

 Because indemnity provisions seek to shift the risk of one party's future negligence to the other party, Texas imposes a fair notice requirement before enforcing such agreements. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex.1993). The fair notice requirements are the express negligence doctrine and the conspicuousness requirement. *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex.2004). Under the express negligence doctrine, an intent to indemnify one of the parties from the consequences of its own negligence, "must be specifically stated in the four corners of the document." *Id.* (quoting *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707 (Tex.1987)). The conspic-

uousness requirement mandates that "something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it." *Id.* (quoting *Dresser,* 853 S.W.2d at 508). Language is conspicuous if it appears in larger type, contrasting colors, or otherwise calls attention to itself. *Dresser,* 853 S.W.2d at 511; *see also* Tex. Bus. & Com. Code Ann. § 1.201(b)(10) (Vernon Supp. 2006). Whether an agreement meets the conspicuous requirement is a question of law for the court. *Dresser,* 853 S.W.2d at 509. An agreement that does not "satisfy either of the fair notice requirements when they are imposed is unenforceable as a matter of law." *Reyes,* 134 S.W.3d at 192.

In *Glendale Construction Services, Inc. v. Accurate Air Systems, Inc.,* we held that an indemnity agreement that used language substantially similar to the language in the Gilbane–Keystone contract did not show an express agreement for the contractor (here, Keystone) to indemnify the general contractor (here, Gilbane) for the negligence of the general contractor's own negligence. 902 S.W.2d 536, 539 (Tex. App.-Houston [1st Dist.] 1995, writ denied). Here, only Gilbane was sued for negligence; Keystone was not sued. Therefore, after reviewing the contractual language used here, we conclude that the contractual language does not meet the express negligence test because it does not expressly provide that Keystone will indemnify Gilbane for Gilbane's own negligence. Thus, the contractual indemnity provision is unenforceable. *See Fisk Elec.*

*Co. v. Constructors & Assocs.,* 888 S.W.2d 813, 815 (Tex.1994) ("Either the indemnity agreement is clear and enforceable or it is not."); *Cabo Const. Inc. v. R.S. Clark Const. Inc.,* 227 S.W.3d 314, 318-19 (Tex. App.-Houston [1st Dist.], no pet.).

 Gilbane argues, however, that it is not seeking to be indemnified for its own negligence, but rather for Keystone's sole negligence in causing Nava's injuries.[5] Keystone does not respond to Gilbane's argument other than stating, "Gilbane's and Zurich's argument that they should now be allowed to seek a determination regarding the possible negligence of Keystone for the Nava settlement simply retards rather than advances the policy of preventing satellite litigation regarding the interpretation of indemnity contracts." We agree.

This case is analogous to *Fisk Electric Co. v. Constructors & Associates,* 888 S.W.2d 813 (Tex.1994). In *Fisk,* the trial court granted judgment in favor of the sub-contractor-indemnitor, Fisk, finding that the indemnity agreement did not satisfy the express negligence test. *Id.* The court of appeals reversed, holding that to obtain summary judgment and to avoid liability under the indemnity agreement, the indemnitor must first establish the indemnitees' negligence. *Id.* The Texas Supreme Court reversed the court of appeals, holding that "no obligation to indemnify an indemnitee for the costs or expenses resulting from a claim made against it for its own negligence arises unless the indemnification agreement complies with the ex-

---

5. Keystone responds that Gilbane seeks comparative indemnity which it cannot recover. Comparative indemnity must arise from a contract that satisfies the express negligence rule. *See Ethyl Corp. v. Daniel Constr. Co.,* 725 S.W.2d 705, 708–09 (Tex.1987) (stating that "Parties may contract for comparative indemnity so long as they comply with the express negligence doctrine...."); *Lee Lewis*

*Constr., Inc. v. Harrison,* 64 S.W.3d 1 (Tex. App.-Amarillo 1999), *aff'd on other grounds,* 70 S.W.3d 778 (Tex.2001). To the extent that Gilbane is trying to rely on comparative indemnity to recover from Keystone, Gilbane loses on this point because the indemnity agreement does not satisfy the express negligence rule.

press negligence test." *Id.* at 813–14. The supreme court stated that an indemnity agreement is "clear and enforceable or it is not" and that "[s]uch a determination should not depend on the outcome of the underlying suit, but should be established as a matter of law. . . ." *Id.* at 815.

In *Fisk*, the indemnitee argued that the indemnitor should have to pay defense costs. The supreme court responded that the indemnitee's interpretation regarding defense costs "would leave indemnitors liable for a cost resulting from a claim of negligence which they did not agree to bear" and "would also leave indemnitors vulnerable to indemnitees who might settle cases without admitting negligence, leaving the indemnitor to pay the costs of settlement and defense." *Id.* The supreme court also held that "[w]ithout an express reference in the indemnification provision to claims based upon negligence, there is no indemnity for defense costs incurred in connection with a negligence claim irrespective of whether the claim is ultimately proved." *Id.* at 815–16.[6]

Here, Gilbane settled the case for $2 million dollars and now seeks indemnity from Keystone, asserting that Keystone is solely liable for Nava's injuries. As the Texas Supreme Court foreshadowed, Gilbane seeks to have Keystone pay for its settlement. *Id.* at 815. To allow Gilbane to litigate the question of who caused Nava's injuries post-settlement and without a valid indemnity agreement "retards rather than advances the policy of preventing satellite litigation regarding interpretation of indemnity contracts." *Id.* at 815 n. 2. Because the Gilbane–Keystone contract does not contain a valid indemnity agreement applicable to this case, we hold that

the trial court properly granted summary judgment on Gilbane's contractual indemnity claim.

We overrule Gilbane's first issue on appeal.

## Breach of Contract

■ In its second issue on appeal, Gilbane argues that the trial court incorrectly granted summary judgment on its breach of contract cause of action. Specifically, Gilbane contends that Keystone breached the Gilbane–Keystone contract by failing to require its excess carrier, Royal Insurance, to provide coverage that was primary to the policy issued by Zurich to Gilbane.

■ Absent ambiguity, we interpret a contract as a matter of law. *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999). "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). The language in a contract is to be given its plain grammatical meaning unless doing so would defeat the parties' intent. *DeWitt County Elec. Coop.*, 1 S.W.3d at 101. We presume that the parties intend-

---

**6.** The supreme court noted that the indemnitees admitted that "if the plaintiff in the underlying suit were successful, [the indemnitor] would not be obligated to pay anything to [the indemnitee] because the agreement fails to satisfy the express negligence test." *Fisk Elec. Co. v. Constructors & Assocs.*, 888 S.W.2d 813, 815 (Tex.1994).

ed every clause to have an effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996).

Schedule "A" of the Gilbane–Keystone contract is entitled, "Insurance Specifications." The specifications state,

> Gilbane Building Company and William Marsh Rice University are each to be named as an "Additional Insured" on all Liability Insurance.

> Provide Waiver of Subrogation on all divisions of Liability Coverage in favor of Gilbane Building Company and William Marsh Rice University

> Commercial General Liability to be provided on an 'occurrence' basis, with coverage to include explosion, collapse and underground hazards ... Blanket Contractual, Products Independent Contractors, Completed Operations, Personal Injury, and employees as additional insured.

> Bodily Injury Limits: $1,000,000 each occurrence. $1,000,000 aggregate.

> Personal Injury Limits: $1,000,000 each occurrence. $1,000,000 aggregate.

> Aggregate shall apply to this project only ... and must be identified as such on the certificate of insurance.

> Excess Umbrella Liability, to provide insurance in excess of Employers' Liability, Commercial General Liability, and Automobile Liability policies required hereunder: $5,000,000 each occurrence and $5,000,000 general policy aggregate.

Gilbane contends that the overall intent of the insurance specifications required protection for Gilbane "up to the minimum amount of $6,000,000 before Gilbane or its insurance carrier should have to respond to claims asserted against Gilbane for accidents arising out of Keystone's performance or lack of performance of their contract."

Keystone responds that Gilbane failed to specify that Keystone's insurance would be primary to Gilbane's insurance and that nothing in the contract "required Keystone to secure an umbrella insurance policy that would have priority over Gilbane's other insurance with respect to claims arising out of the [contract]." We agree.

■ Although the insurance specifications require Keystone to maintain an umbrella policy in the amount of $5 million, the contract does not specify the priorities between Keystone's insurance and any other insurance. To interpret the contract under Gilbane's analysis, we would have to add a provision stating that the umbrella policy would be primary to Gilbane's insurance. We decline to do so. Parties should be held to the contract that they drafted. *See Lambert v. Affiliated Foods, Inc.*, 20 S.W.3d 1, 6 (Tex.App.-Amarillo 1999), *aff'd*, 44 S.W.3d 544 (Tex.2001) (stating courts are not permitted to draft new contract between parties, "regardless of whether one or more of the parties contracted wisely or foolishly, or created a hardship for himself"). Here, it is undisputed that Gilbane drafted the Gilbane–Keystone contract and the insurance specifications. Thus, because the insurance specifications do not require Keystone's umbrella policy to be primary insurance above any and all additional insurance, Keystone did not breach its agreement to obtain excess insurance in the amount of $5 million dollars. Accordingly, the trial court properly granted summary judgment on Gilbane's breach of contract cause of action.

Gilbane next argues that if we adopt Keystone's interpretation of the contract, we would have to ignore the waiver of subrogation clause, the requirement that Keystone provide excess coverage, and the additional insured requirements in the contract.

"Subrogation" is the right of one who has paid an obligation that another should have paid to be indemnified by the other. *Texas Ass'n of Sch. Bds., Inc. v. Ward,* 18 S.W.3d 256, 258 (Tex.App.-Waco 2001, pet. denied). The object of such subrogation is to prevent the insured from receiving a double recovery. *Argonaut Ins. Co. v. Allstate Ins. Co.,* 869 S.W.2d 537, 541 (Tex.App.-Corpus Christi 1993, writ denied). An insurer's right to subrogation derives from the rights of the insured and is limited to those rights. *Interstate Fire Ins. Co. v. First Tape, Inc.,* 817 S.W.2d 142, 145 (Tex.App.-Houston [1st Dist.] 1991, writ denied). A release between the insured and an offending party prior to a loss destroys the insurance company's rights by way of subrogation. *Id.*

We fail to see how Gilbane's negotiation of the waiver of subrogation right meant that Keystone's excess insurance would be primary to Gilbane's insurance.[7] Instead of implying the meaning of the contract based on various clauses, we construe the contract pursuant to its plain meaning. Here, the contract does not provide for the priority of insurance. Also, subrogation is based on receiving indemnity from another party. Here, we have already determined that the Gilbane–Keystone contract did not contain an enforceable indemnity agreement.

Gilbane also argues that because the insurance specifications required Keystone to name Gilbane as an additional insured on all insurance policies, such requirement expresses the intent that "Gilbane be protected by Royal's excess coverage before looking to Gilbane's coverage." Gilbane cites no authority for the proposition that being named as an additional insured

means that the insurance policy will be primary to all other insurance. As Keystone aptly points out, had Nava's claims been for $4 million dollars, the primary policies would have been exhausted and the excess coverage would have been available. We disagree that a requirement for Keystone to name Gilbane as an additional insured automatically means that any insurance coverage obtained by Keystone would be primary to insurance procured by Gilbane.[8]

We overrule Gilbane's second issue on appeal.

**Reformation of Contract**

In its third issue on appeal, Gilbane argues that the trial court erred by refusing to reform the contract to reflect the parties' intent that Keystone would provide "insurance coverage up to at least the sum of $6 million that was primary to any insurance policy issued directly to Gilbane for losses arising out of the work performed by Keystone."

Gilbane argues that the parties intended that coverage provided by Keystone would be primary to Gilbane's own coverage up to at least $6 million. Gilbane relies on the testimony of Scott Anderson, the Vice–President and General Manager of Keystone, and Marshal Lightman, the Vice–President and Regional Controller for Gilbane, to establish that coverage provided by Keystone would be primary to Gilbane's own coverage.

If a written contract fails to reflect a party's original agreement due to a mutual mistake, the court may reform the contract to properly reflect the party's true agreement. *See Cherokee Water Co. v. Forderhause,* 741 S.W.2d 377, 379 (Tex.

---

7. Gilbane cites no authority for its argument. *See* Tex.R.App. P. 38.1(h).

8. Gilbane cites no authority for its argument. *See id.*

1987). In *St. Paul Fire & Marine Ins. Co. v. Culwell,* the court stated,

> Equity has jurisdiction to reform written instruments in cases of mutual mistake, but a written contract will not be reformed in equity because of a mistake, in the absence of fraud, unless it is mutual; that is, common to both parties, and each under the same mistake as to its terms.

62 S.W.2d 100, 101 (Tex. Comm'n App. 1933, judgm't adopted). "Knowledge by one party of the other's mistake regarding the expression of the contract is equivalent to mutual mistake." *Warren v. Osborne,* 154 S.W.2d 944, 946 (Tex.Civ.App.-Texarkana 1941, writ ref'd w.o.m.) (quoting WILLISTON ON CONTRACTS, Vol. III, 2745). Gilbane relies on the testimony of Scott Anderson and Lightman to establish mutual mistake. Anderson testified to the following by deposition:

Q. Did you have any conversations, during the process of bidding the job at Rice University or in entering the contract with anybody from ... Gilbane about what the insurance requirements were?

A. No, at no time did I discuss insurance with Gilbane.

Q. Were there insurance requirements contained in these specifications, if you recall?

A. As I recall, there were insurance requirements at the time we looked at the project.

Q. What is your recollection of what those insurance requirements were, if you have one?

A. As best I can recall, it required about a million dollars of coverage through our normal general liability, and then it had an umbrella requirement. I do not remember the number, but it was probably several million dollars more, umbrella coverage beyond the $1 million.

. . .

Q. Do you recall whether or not there was any issue or designation as to whether or not that umbrella was to be primary to any insurance that Gilbane had?

A. No.

Q. Okay. And let me ask it—clarify the question. When you say no, do you mean you recall that, or you do not believe that it was required, the primary?

A. There was no conversation that our insurance would be primary. The insurance was whatever was stated in the documents is all that I know.

Q. Okay. Well, what was your understanding?

A. My understanding is that typically the general contractor, that is what they were trying to accomplish.

Q. Okay.

A. However, in this particular instance, I feel the documents were ambiguous enough that that may not have been accomplished through what they presented and what we all signed. And at no time did we actually discuss insurance requirements with Gilbane.

Q. So, your understanding was that that would ordinarily be what was required, but you didn't feel like the documents were clear enough to express that intent?

A. I believe that typically the general contractor, trying to limit his risk, would try and do that.

Q. Okay.

A. In this case, I believe that the documents are not necessarily specific enough that that would happen.

Beyond that is a matter with the insurance companies and you all can decide what it is.

Q. Okay.

A. But I felt that there was some ambiguity and it did not do any harm to my position, as far as managing risk, to sign the documents as they were.

Q. Okay. So, you had that belief even at the time that the contract documents were being signed.

A. That is correct.

Q. Okay. And you were not clear one way or the other whether or not they expressed that intent, that your insurance would be primary, correct?

A. Let me make sure I get this right. I believe that our general liability policy would have been the primary coverage at first. And beyond that, I do not know which would be covered because, as I said before, I felt the documents had some measure of ambiguity to them that did not hurt my risk management as the project manager or as the vice president of the company.

Q. You felt it could have gone either way but you didn't—

A. That's correct.

Q. And you didn't do anything to clarify that?

A. That is correct.

Q. You didn't contact Gilbane to see what their intent was?

A. No, sir.

Marshal Lightman, testified by affidavit that

It is Gilbane's general practice and it was the intent as to the Keystone Structural Concrete contract that Keystone Structural Concrete provide liability insurance coverage up to sum of $6 million dollars and that such coverage name Gilbane as an additional insured and provide that the $6 million in coverage be primary to Gilbane's insurance coverage for any loss arising out of the work of Keystone Structural Concrete.

Keystone responds that the testimony of Anderson and Lightman provides no evidence that would require the trial court to reform the contract. We agree. Neither Anderson's testimony nor Lightman's testimony shows that the parties discussed primary insurance and agreed that Keystone's excess insurance would be primary to Gilbane's insurance. Thus, Gilbane presented no evidence of a mutual mistake, and the trial court properly granted summary judgment on Gilbane's contract reformation argument.

We overrule Gilbane's third issue on appeal.

**Additional Breach of Contract Cause of Action**

 In its fourth issue on appeal, Gilbane argues that the trial court improperly granted summary judgment on its breach of contract cause of action. Specifically, Gilbane argues that Keystone breached its contractual obligations to "make sure that the equipment Keystone Structural Concrete used was in a safe condition and that Keystone Structural Concrete performed its duties in compliance with all applicable regulations, codes, ordinances, and statutes and that such breach resulted in damages to Gilbane in the form of the claim of Mr. Nava."

In the Gilbane–Keystone contract, Keystone agreed to the following provisions:

9.5 The Trade Contractor agrees to adhere to the federal occupational safety act, state and local safety regulations and the Construction Manager's safety and health program so as to avoid injury or dam-

age to persons or property, and to be directly responsible for damage to persons and property resulting from failure to do so.

9.15 The Trade Contractor shall insure that all construction tools, equipment, temporary facilities, and other items used in accomplishing the work, whether purchased, rented, or otherwise provided by the Trade Contractor or provided by others, are in a safe, sound, and good condition [and] must be capable of performing the functions for which they are intended and must be maintained in conformance with applicable laws and regulations.

Gilbane contends that "Keystone assumed any responsibilities that Gilbane may have had to comply with safety requirements, including the provision of a safe place for Mr. Nava to work and safe tools and equipment for Mr. Nava to use in the performance of his work." Gilbane further contends that:

To the extent that Mr. Nava's injuries were caused in whole or part by any of the [allegations in Nava's petition against Gilbane], the responsibilities for performing those duties to Mr. Nava had been exclusively assumed by Keystone pursuant to [provisions 9.5 and 9.15]. By failing to perform those contractual obligations, Keystone breached its contract with Gilbane.

Keystone responds that Gilbane's cause of action for breach of the contractual provisions is just another way of pursuing its indemnity claim. Keystone also argues that regardless of how Gilbane refers to the claim, section 417.004 of the Texas Labor Code bars Gilbane's recovery. Section 417.004 provides,

In an action for damages brought by an injured employee, a legal beneficiary, or an insurance carrier against a third party liable to pay damages for the injury or death under the chapter that results in a judgment against the third party or a settlement by the third party, the employer is not liable to the third party for reimbursement or damages based on the judgment or settlement unless the employer executed, before the injury or death occurred, a written agreement with the third party to assume the liability.

TEX. LAB.CODE ANN. § 417.004 (Vernon 2006).

The Texas Supreme Court has stated that section 417.004 "prohibits indemnity in a workers' compensation context unless one party expressly agrees to indemnify the other in writing." *Enserch v. Parker*, 794 S.W.2d 2, 7 (Tex.1990) (emphasis omitted). The indemnity agreement here is unenforceable because it fails to comply with the express negligence rule. *See id.* Accordingly, we hold that section 417.004 bars Gilbane's breach of contract claims against Keystone.

We overrule appellants' fourth issue on appeal.

**Duty to Inform**

██ In its fifth issue on appeal, Gilbane argues that the trial court improperly granted summary judgment on its claim that Keystone had a duty to, but failed to advise Gilbane of the existence of the Northern Insurance Company of New York ("Northern Insurance") policy under which Gilbane was an additional insured. Alternatively, Gilbane argues that the trial court improperly granted summary judgment on this claim based on Keystone's contention that the claim was not ripe.

The Gilbane–Keystone contract required Keystone to secure $1 million in insurance and $5 million in excess insurance. Pursuant to the contract, Keystone secured a

policy from Admiral Insurance for $1 million and secured $5 million in an umbrella policy. Although not stated in the Gilbane–Keystone contract, Keystone secured an additional $1 million in insurance from Northern Insurance.

In its supplemental motion for summary judgment, Keystone argued that Gilbane's loss of coverage complaint was not ripe because Northern had not yet denied coverage and that Keystone had no duty to inform Gilbane of the Northern Insurance. Gilbane responded that Keystone had a duty to inform it about the Northern Insurance because the insurance specifications stated that Gilbane would be named as an insured on all insurance policies and that to have that requirement without the corresponding duty to inform Gilbane about the insurance would "fly in the face of common sense."

Gilbane cites no authority for its argument that Keystone had a "duty" to inform it of the additional insurance. *See* TEX. R.APP. P. 38.1(h). Furthermore, the insurance specifications are silent regarding whether Keystone is required to inform Gilbane of all insurance that Keystone procures. The insurance specifications state that Keystone will "furnish certificates of insurance with Gilbane Building Company's project name and number stated on the certificates and submit prior to the beginning of on-site operations." Keystone complied with this requirement in that the insurance specifications require, at a minimum, $1 million in commercial general liability insurance and $5 million in an excess umbrella liability policy.

Gilbane argues in its reply brief, however, that the insurance specifications required more than the $1 million in primary coverage and $5 million in excess coverage that Keystone had to obtain before it could begin on-site operations. Gilbane's argument is undermined by the underlying facts in that it is undisputed that Keystone submitted certificates of insurance with the minimum amounts listed above that named Gilbane as an additional insured and that, thereupon, Gilbane allowed Keystone to start the on-site operations. Thus, we disagree with Gilbane's argument that more insurance was required by Keystone.

Because the contract did not require Keystone to inform Gilbane of the Northern Insurance policy and Gilbane cites no authority to the contrary, the trial court properly granted summary judgment on Gilbane's loss of coverage cause of action.[9]

## Conclusion

We affirm the judgment of the trial court.

---

9. Because we conclude that the trial court properly granted summary judgment on Gilbane's duty-to-inform issue, it is unnecessary to address its alternative argument that the trial court erred in granting summary judgment on its loss-of-coverage issue based upon a "lack of ripeness." *See* TEX.R.APP. P. 47.1.