In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00261-CV
_____

S&B ENGINEERS & CONSTRUCTORS, LTD. AND
ZURICH AMERICAN INSURANCE COMPANY, Appellants

V.

SCALLON CONTROLS, INC., Appellee

On Appeal from the 172nd District Court
Jefferson County, Texas
Trial Cause No. E-198,919

**MEMORANDUM OPINION**

In this appeal, defendants (and an insurer) who paid to settle a lawsuit are seeking a recovery from a third-party-defendant for the amounts paid in the settlement. Appellant S&B Engineers and Constructors, Ltd. ("S&B") appeals from an Order on Cross Motions for Summary Judgment. In the order, the trial court granted summary judgment in favor of Appellee Scallon Controls, Inc. ("Appellee" or "Scallon") on all claims asserted against Scallon and denied S&B's motion for

1

partial summary judgment against Scallon. In four issues on appeal, S&B argues that the trial court erred. Appellant Zurich American Insurance Company ("Zurich"), who was an intervenor in the trial court and asserted subrogation rights as Sunoco's[1] insurer, also appeals. As explained herein, we affirm.

Background

Seven individual plaintiffs ("Individual Plaintiffs") filed a personal injury lawsuit against Sunoco Logistics Partners Operations GP LLC, Sunoco Logistics Partners LP (collectively "Sunoco"), and S&B.[2] The Individual Plaintiffs alleged they were employed by Insulations, Inc. as insulators and insulator helpers, and on January 5, 2015, they were working at a Sunoco Logistics Terminal. While working, they heard a loud noise or explosion and saw a thick "chemical cloud" (later determined to be a fire suppressant chemical called "Purple K") moving toward them. As they tried to leave the work area, several of them fell and sustained injuries. According to the petition, the Fire Suppression System was activated while the S&B instrument technicians were working in the area, and when they attempted to "put the system in alarm fail," it caused the loud noise the Individual Plaintiffs heard and

[1] Sunoco is not a party to this appeal. At trial, Sunoco Logistics Partners Operations GP LLC and Sunoco Logistics Partners LP (collectively "Sunoco") were defendants.

[2] We do not name the individual plaintiffs but rather refer to them herein collectively as "the Individual Plaintiffs" because the Individual Plaintiffs settled their claims, and this appeal concerns claims between the defendant S&B, Sunoco's insurer (intervenor Zurich), and third-party defendant Scallon.

the cloud that the Individual Plaintiffs saw. The Individual Plaintiffs alleged that the Defendants' (S&B and Sunoco) negligence proximately caused their injuries.[3]

S&B filed a general denial answer and an Original Third-Party Petition against Scallon. In the Third-Party Petition S&B alleged that Scallon's negligence in performing "PLC Technical Services"[4] was a proximate cause of the release of Purple K and of the Individual Plaintiffs' injuries. S&B also asserted that if S&B is found liable for Individual Plaintiffs' damages, then Scallon, as a third-party defendant, would be liable to S&B for contribution. According to S&B's third-party petition, it entered into a Subcontract Agreement ("Subcontract") with Scallon that included a provision that Scallon defend, indemnify, and hold S&B harmless against any and all losses. S&B asserted a claim for contribution and indemnity under the Subcontract Agreement and a Purchase Order.

---

[3] Specifically, the Individual Plaintiffs alleged the following acts or omissions of negligence by all the Defendants: failure to provide a safe environment; failure to inspect the worksite to make sure it was safe; failure to remedy the condition on the premises that caused the Individual Plaintiffs' injuries; failure to warn the Individual Plaintiffs of the sound of an explosion or the release of the cloud; negligent installation of the fire suppression system; negligent check of the fire suppression system in a crowded area with workers present; negligent inspection of the fire suppression system; negligent coordination of work on the fire suppression system and in the Area 250 Pipe Rack; negligent training of employees working on or around the fire suppression system; and negligent purchase and use of the fire suppression system.

[4] A purchase order included in the record reflects "PLC" refers to "Programmable Logic Controller."

Sunoco also filed a third-party petition against Scallon. According to Sunoco, discovery revealed that software and hardware errors had resulted from Scallon's negligence, Scallon had subcontracted with S&B to provide services, and Scallon's negligence was the proximate cause of the accidental release of fire retardant. Sunoco sought contribution and indemnity from Scallon.

In its Answer, Scallon asserted a general denial and the following affirmative defenses: the injuries were caused by the acts or omissions of others for whom Scallon was not responsible; the injuries resulted from new and independent intervening or superseding causes; the injuries resulted from Third-Party Plaintiff's own negligence. We include a chart below to demonstrate the relationship of the parties.



Over the course of the underlying lawsuit, S&B amended its petition against Scallon, and S&B's Ninth Amended Original Petition was S&B's live pleading when the trial court rendered its Final Judgment. In the Ninth Amended Original Petition, S&B asserted claims against Scallon pursuant to its Subcontract, as well as the Terms and Conditions of the Purchase Order. S&B asserted a claim for breach of contract, alleging that Scallon (1) changed the work from what was instructed without obtaining prior written approval by S&B, and (2) Scallon failed to indemnify S&B as required by the Purchase Order and Subcontract. S&B also asserted a claim against Scallon for breach of express warranty under both the Purchase Order and Subcontract, alleging that Scallon's work had defects and did not conform to S&B's specifications. Specifically, S&B alleged that it directed Scallon that both the inputs and outputs of the Fire Suppression System should be configured as "non-fail-safe" but that Scallon configured the inputs as "fail-safe." S&B also asserted claims for breaching the implied warranty of fitness for a particular purpose and the warranty of merchantability under the UCC.[5] S&B sought damages of $2,350,000 that it paid in settling with the Individual Plaintiffs plus $2,000,000 paid by insurers on its behalf, Zurich American Insurance Company ("Zurich") and American Guarantee and Liability Insurance Company.

---

[5] Citing Tex. Bus. & Com. Code Ann. §§ 2.314, 2.315.

5

Scallon filed a Counterclaim against S&B, alleging that S&B failed to meet its obligations under the Sunoco Contract, and S&B's errors and omissions were the proximate cause of the equipment failure, the release of Purple K, and the Individual Plaintiffs' injuries, and sought a recovery of Scallon's attorney's fees and expenses in the lawsuit. Scallon also demanded that S&B defend and indemnify Scallon pursuant to the parties' Subcontract. The Counterclaim also stated a claim for breach of contract, alleging that S&B breached its obligations under the Subcontract to defend and indemnify Scallon. Scallon pleaded actual and consequential damages, attorney's fees, and interest.

S&B and Sunoco settled with all the Individual Plaintiffs. Copies of the confidential settlement agreements that are in the record include a provision in which the Individual Plaintiffs agree that all their claims against Defendants S&B and Sunoco are fully released and discharged, and a provision in which S&B and Sunoco fully and completely release and discharge each other from all claims relating to the matter. After the settlements, the lawsuit was restyled as *S&B Engineers and Constructors, Ltd., Sunoco Logistics Partners Operations GP LLC, and Sunoco Logistics Partners LP, Plaintiffs v. Scallon Controls, Inc., Defendant*. Thereafter, Sunoco also nonsuited its claims without prejudice, and Zurich filed a Petition in Intervention asserting subrogation claims, seeking to recover the amounts it paid on behalf of Sunoco, its insured, to settle with the Individual Plaintiffs.

6

Subcontract and Purchase Order

The Subcontract between S&B and Scallon is styled "Short Form Subcontract Agreement[,] PLC Technical Services" and states that it is for "Subcontracted Services (Services/Work)"—namely, "labor, equipment, tools, and consumables necessary as needed to complete the PLC Technical Services"—and "[t]hese services are for equipment purchased on S&B Purchase order number C1505-I0050." ("Purchase Order") The Subcontract was signed by the parties' representatives in September and October of 2014. The first page of the Subcontract defines the S&B as the Contractor and Scallon as the Subcontractor. The Subcontract includes the following provisions at issue in this lawsuit:

> **2. Warranty and Guarantee.** All articles, materials and Work, furnished by or through SUBCONTRACTOR shall be of good quality and free from any defects and conform to CONTRACTOR'S specifications, and shall at all times be subject to CONTRACTOR'S inspection; but neither CONTRACTOR'S inspection nor failure to inspect shall relieve SUBCONTRACTOR of any obligation hereunder.
>
> **9. Liability Indemnity. SUBCONTRACTOR [SCALLON] SHALL BE SOLELY RESPONSIBLE FOR ALL MATERIALS, EQUIPMENT AND SERVICES UNTIL THE WORK IS COMPLETED TO CONTRACTOR'S SATISFACTION. SUBCONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR TOOLS, EQUIPMENT AND OTHER PROPERTY OWNED, RENTED OR LEASED BY SUBCONTRACTOR OR EMPLOYEE WHICH ARE NOT TO BE INCORPORATED INTO THE WORK.**
>
> SUBCONTRACTOR SHALL DEFEND, INDEMNIFY AND SAVE HARMLESS THE CONTRACTOR [S&B] AND OWNER [SUNOCO] AND THEIR PARENTS AND AFFILIATED COMPANIES ("INDEMNITEES") FROM AND AGAINST ANY

AND ALL LOSS, DAMAGE, INJURY, LIABILITY, AND CLAIMS THEREOF FOR INJURY TO OR DEATH OF ANY PERSON (INCLUDING AN EMPLOYEE OR SUBCONTRACTOR OF AN INDEMNITEE) OR FOR LOSS OF OR DAMAGE TO PROPERTY (INCLUDING THE PROPERTY OF INDEMNITEES) OR FOR LOSS OR DAMAGE ARISING FROM ATTACHMENTS, LIENS OR CLAIMS OF MATERIALMEN OR LABORERS TO THE EXTENT CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF SUBCONTRACTOR. CONTRACTOR SHALL DEFEND, INDEMNIFY AND SAVE HARMLESS THE SUBCONTRACTOR FROM AND AGAINST ANY AND ALL LOSS, DAMAGE, INJURY, LIABILITY, AND CLAIMS TO THE EXTENT CAUSED BY CONTRACTOR. THIS INDEMNITY SHALL NOT APPLY TO THE EXTENT THAT SUCH INDEMNIFICATION IS VOID OR OTHERWISE UNENFORCEABLE UNDER APPLICABLE LAW IN EFFECT ON OR VALIDLY RETROACTIVE TO THE DATE OF THIS AGREEMENT. THE INDEMNITEES' RIGHTS TO INDEMNIFICATION BY SUBCONTRACTOR UNDER THE FOREGOING SHALL BE INDEPENDENT OF THEIR RIGHTS UNDER INSURANCE PROVIDED UNDER SECTION 10.

**13. Changes.** SUBCONTRACTOR shall make no change in the Work, or perform any additional Work without CONTRACTOR'S specific prior written approval, CONTRACTOR may order changes in the Work, or require additional Work at any time, and SUBCONTRACTOR shall comply therewith, but the price hereunder shall be increased by an amount as approved by CONTRACTOR.

**24. CONSEQUENTIAL, INDIRECT, INCIDENTAL OR SPECIAL DAMAGES.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, OR SPECIAL DAMAGES INCLUDING BUT NOT LIMITED TO LOSS OF PLANT CAPACITY, LOSS OF BUSINESS OR ANY OTHER SUCH LOSS, HOWSOEVER CAUSED, INCLUDING BY THE NEGLIGENCE OR STRICT LIABILITY OF EITHER PARTY.

The parties' Purchase Order number C1505-I0050, dated December 13, 2013, states that it "will be governed by the attached mutually agreed upon terms and conditions between S&B Engineers and Constructors, Ltd. and Scallon Controls, Inc., dated 11/19/13." The Terms and Conditions attached to the Purchase Order include the following relevant provisions:

**11. WARRANTY.** Seller [Scallon] represents and WARRANTS: (1) that the articles herein described are fit for use for the specified purpose for which they are purchased by S&B and are free from defect in design, workmanship, and material and are in strict accordance with the specifications hereof, unless otherwise agreed in writing and Seller agrees to replace without cost any article, material or workmanship which shall be found defective within eighteen (18) months after start-up or twenty-four (24) months from shipment, whichever occurs first; (2) that said articles and the sale or use of them does not infringe, directly or indirectly, any valid patent, copyright or trademark, and that Seller will, at Seller's cost and expense, defend, indemnify and hold S&B, and its affiliated companies, sub-contractors, and clients harmless from and against any claims, demands, actions and litigation based on alleged or actual infringement thereof; (3) that all amounts charged by the Seller and payable pursuant hereto are lawfully chargeable under and shall not violate, directly or indirectly, the provisions of any present or future laws, decrees, regulations, rules or orders of any governmental authority which in any manner fix, limit, regulate, or otherwise affect prices at which said articles may be sold; (4) that all United States statutes, applicable to furnishing labor and materials or sales merchandise for use on government contracts, have been fully complied with; and (5) that where Seller is furnishing articles in accordance with designated plans and specifications, that all articles furnished meet and perform in accordance with such plans and specifications. These WARRANTIES are in addition to, and shall not be construed as restricting or limiting any warranties of the Seller, express or implied, or which are provided by law or exist by operation of law. These warranties shall run to the benefit of S&B and its affiliated companies, subsidiaries and clients.

9

**12. LIABILITY AND INDEMNITY.**

. . .

**Other Claims.** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, SELLER [Scallon] SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS S&B, AND ITS AFFILIATED COMPANIES, SUBSIDIARIES AND CLIENTS FROM AND AGAINST ANY AND ALL LOSS, DAMAGE, CLAIM, SUIT, LIABILITY, STRICT LIABILITY, PRODUCT LIABILITY, JUDGMENT AND EXPENSE (INCLUDING ATTORNEY'S FEES AND OTHER COSTS OF LITIGATION) AND ANY FINES, PENALTIES AND ASSESSMENTS, ARISING OUT OF (A) DAMAGE TO OR LOSS OF PROPERTY OR (B) BODILY INJURY, DISEASE OR DEATH TO PERSONS OTHER THAN EMPLOYEES OF SELLER, ITS AGENTS OR SUBCONTRACTORS RESULTING FROM OR IN CONNECTION WITH THE EXECUTION OF THIS PURCHASE ORDER TO THE EXTENT OF SELLER'S NEGLIGENCE OR WILLFUL MISCONDUCT. IN CASE OF COMPARATIVE, CONCURRENT AND/OR CONTRIBUTING NEGLIGENCE, FAULT OR STRICT LIABILITY OF SELLER OR BUYER, WHETHER THROUGH ITS EMPLOYEES AND/OR REPRESENTATIVES, SELLER'S DUTY TO INDEMNIFY AND HOLD HARMLESS REFERRED TO IN THE PREVIOUS SENTENCE SHALL BE SELLER'S ALLOCABLE SHARE OF COMPARATIVE, CONCURRENT AND/OR CONTRIBUTING NEGLIGENCE, FAULT OR STRICT LIABILITY.

Motions for Summary Judgment

Scallon's Traditional and No-Evidence MSJ Against S&B

Scallon filed a traditional and no-evidence motion for summary judgment seeking a judgment against S&B. Therein, Scallon argues that, although S&B alleged that Scallon breached the parties' Subcontract by configuring the inputs as "fail-safe" when the work called for them to be configured as "non-fail-safe," the Final Acceptance Testing sign off sheets (which were exhibits to Scallon's motion)

10

reflect that S&B approved the configuration and that Scallon installed the inputs the way they were approved by S&B. Scallon also argues that the indemnity provision in the Subcontract is unenforceable against Scallon because the Individual Plaintiffs only alleged negligence claims against S&B and Sunoco, and the Individual Plaintiffs made no allegations of negligence by Scallon.[6] According to Scallon, because S&B settled with the Individual Plaintiffs, S&B's claim against Scallon for indemnification "effectively seeks to have Scallon pay for [S&B's] settlement."

Scallon argues it is also entitled to judgment as a matter of law on S&B's claims for breach of contract and breach of express warranty. As to S&B's breach of contract claim, Scallon argues there is no evidence that Scallon breached the terms of the Subcontract or that S&B sustained damages as a result of any breach. As to S&B's claim for breach of express warranty, Scallon argues there is no evidence of an express promise by Scallon relating to the goods, no evidence that S&B relied on any promise, no evidence that the goods failed to comply with any promise, and no evidence that S&B was injured thereby.[7]

---

[6] Citing *Fisk Elec. Co. v. Constructors & Assocs.*, 888 S.W.2d 813 (Tex. 1994) (applying the "express negligence doctrine," whereby a party seeking indemnity from consequences of its own negligence must clearly express that intent in language that contains specific terms within the four corners of the contract).

[7] Citing *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 681 (Tex. App.—Austin 2002, pet. denied) (reciting the elements for breach of express warranty).

11

S&B's Traditional Motion for Partial Summary Judgment

S&B filed a traditional motion for partial summary judgment on its claims against Scallon for breach of the warranty of merchantability, breach of an implied warranty of fitness for a particular purpose, and breach of an express warranty. S&B alleged as follows:

> . . . S&B hired Scallon to design, build and configure the logic for a Safety Control System at the Mariner South Terminal Project ("the Project"). The logic included control of a fire suppression system ("FSS") for Tank 2201 on the Project. Relying on his "personal experience," an employee configured the input for the FSS as "fail-safe" or energized. Due to this configuration, the FSS inadvertently discharged when there was a brief momentary loss of power at the Project. As a matter of law, the evidence established the logic in question operating the FSS was not fit for the purpose desired by S&B and the logic was not free of defects.

S&B attached selected pages from a transcript of the deposition of Chris Lampman, a systems engineer for Scallon who worked on the Sunoco project. In the S&B motion, S&B alleged that Lampman testified that he generally designs a program to operate in the way the client wants, and the safety control system at Sunoco was the first time he was involved with a Fire Suppression System. Lampman testified that he used the "cause and effects and control philosophy" to design and build the logic for the fire suppressant system, but he also acknowledged that if the cause and effects philosophy would not have all the information necessary to design and build the logic, in that event he would have either exercised his independent judgment or asked for a consultation with S&B, but he did not recall

12

having requested a consultation with S&B for this project. Lampman testified that, if the cause and effects provided by the client did not specify whether the input for the solenoid on the fire safety system should be non-fail-safe, he would "go with [] the common practice of a fail-safe[.]" In his deposition, Lampman also acknowledged that when the power failed at the project, the dry chemical Fire Suppression System activated because the logic for the fire safety system's inputs were "fail-safe," not non-fail-safe.

S&B also attached selected pages from a transcript of the deposition of Peter Mondello, the Vice President of Systems for Scallon. Mondello testified that he did not know whether S&B directed Lampman to configure the inputs as "fail-safe." Mondello also testified that the fire safety system activated on loss of power to the input and that he could not think of a reason why a refinery or chemical plant would want a fire safety system to discharge in the absence of a fire. According to Mondello, when S&B signed off on and accepted Scallon's work at the conclusion of Factory Acceptance Testimony ("FAT"), the FAT would not reflect whether the fire safety system was configured in fail-safe or non-fail-safe mode.

Another attachment to the motion was selected pages from a transcript of the deposition of Paul Dougharty, who was in charge of Process Control & Safety Systems for S&B at the Project and who was the technical contact for the project. Dougharty testified that S&B told Scallon that the fire safety system needed to be

13

configured as non-fail-safe mode or "de-energized," but that Scallon "pushed back" on this requirement. Dougharty testified there were several discussions between S&B and Scallon employees during which Dougharty explained to Scallon that the fire safety system, unlike other components of the Safety Control System, was to be configured as non-fail-safe or de-energized. According to Dougharty, Scallon was provided documents that indicated that the fire safety system was to be a non-fail-safe system. Dougharty testified that, in an investigation after the incident, he learned from Lampman that Scallon had programmed the system so that all the inputs were configured as fail-safe.

S&B argued that Scallon breached the implied warranties of merchantability and fitness for a particular purpose under the Uniform Commercial Code ("UCC") as codified in the Texas Business and Commerce Code. According to S&B, the undisputed evidence reflects that Scallon sold goods to S&B, including the logic control for the fire safety system, and the logic control for the fire safety system was not fit for its ordinary purpose because it activated and discharged in the absence of a fire. S&B argued that the undisputed evidence also reflects that Scallon knew that S&B hired it to design, build, and configure the logic that would operate the fire safety system, that S&B relied on Scallon's skill to develop a logic that would operate the fire safety system, and that S&B notified Scallon of its breach shortly

14

after the "inadvertent" discharge of the fire safety system. S&B argued that both of these breaches caused S&B to be sued and to incur substantial financial damages.

As to its claim for breach of express warranty, S&B noted that the Subcontract provided that Scallon agreed to provide the labor, equipment, tools, and consumables necessary to complete the PLC Technical Services. S&B argued that paragraph 2 of the Subcontract was an express warranty by which Scallon warranted that all articles, materials, and work it furnished "shall be of good quality and free from any defects and conform to Contractor's specifications[.]" According to S&B, it relied on Scallon's expertise in system integration, and Scallon configured the fire safety system input as "fail-safe[,]" which was "clearly a defect in the logic created by Scallon." S&B argued that because the logic as Scallon configured it was not free of defects, Scallon breached an express warranty to S&B.

Scallon's MSJ Against S&B and Sunoco and Scallon's Response to S&B's MPSJ

Scallon also filed a combined MSJ on S&B's and Sunoco's claims against Scallon and a response to S&B's MPSJ. Scallon asserted that there is no enforceable indemnity agreement, and the express negligence rule precludes S&B and Sunoco from recovering from Scallon. Scallon argues that the indemnity language in its Subcontract with S&B[8] is insufficient under the express negligence rule set forth in

---

[8] Paragraph 2, titled "Warranty and Guarantee," quoted *supra*.

15

*Ethyl Corp. v. Daniel Construction Co.*, 725 S.W.2d 705, 708 (Tex. 1987). In *Ethyl*,

the Court stated:

> The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms. Under the doctrine of express negligence, the intent of the parties must be specifically stated within the four corners of the contract.

*Id.* According to Scallon, in this case S&B and Sunoco are suing for reimbursement

of monies they paid in the face of Individual Plaintiffs' negligence claims for

personal injury, and therefore, they are seeking to get indemnity for their own

negligence, which is impermissible under the express negligence rule and *Ethyl*.

Scallon also argues that S&B and Sunoco cannot argue that the indemnity provision

of the Subcontract "equates to contractual comparative responsibility" because the

*Ethyl* Court also concluded that "[p]arties may contract for comparative indemnity

so long as they comply with the express negligence doctrine[.]" *Id.* at 708-09.

Scallon also argues that the Subcontract was primarily for services and not for

the sale of goods, so that the UCC does not apply, and therefore, S&B (nor Sunoco,

by extension) has no warranty claims. The Subcontract states it is for "Subcontracted

Services (Services/Work)[.]" Scallon argues that the UCC expressly applies only to

contracts for the sale of goods,[9] but where a contract is for both goods and services,

courts determine whether the dominant factor in the transaction is the sale of goods

---

[9] Citing Tex. Bus. & Com. Code Ann. §§ 2.102, 2.106.

or of services.[10] According to Scallon, because the dominant factor of the Subcontract is the sale of services, the UCC does not apply, and S&B is not entitled to summary judgment on its UCC breach of warranty claims. Quoting S&B's MPSJ, Scallon also states that S&B's complaints against Scallon relate to services it rendered on the configuration of the Fire Suppression System, wherein S&B "relied on the expertise of Scallon as self-proclaimed experts in the field of system integration [] to complete site acceptance testing of hardware and software Scallon designed, developed, built and configured."

But even assuming S&B asserted a common law breach of warranty claim for services, Scallon argues that S&B cannot succeed because S&B has failed to establish a breach. According to Scallon, it configured the inputs as "fail-safe" pursuant to industry customs, and there were no written specifications otherwise. Scallon also argues that S&B relies on deposition testimony of "an alleged conversation between Paul Dough[a]rty (S&B) and Scallon employees Steven Erickson, Chris Lampman and Bret Jordan[,]" but section 13 of the Subcontract expressly requires that change orders be made in writing. Even so, Scallon argues

---

[10] Citing *Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 355-56 (Tex. App.—Corpus Christi 2002, pet. denied); *Geotech Energy Corp. v. Gulf States Telecomms. & Info. Sys., Inc.*, 788 S.W.2d 386, 389 (Tex. App.—Houston [14th Dist.] 1990, no writ).

17

that a fact issue exists as to what specifications S&B gave to Scallon, which precludes S&B from prevailing on its MPSJ.

Finally, Scallon argues that paragraph 24 of the Subcontract expressly disclaims any liability for consequential, indirect, incidental, or special damages. According to Scallon, by statute, only actual damages are recoverable for a seller's breach of an implied warranty of merchantability—that is, the difference between the value of the goods accepted and the value of the goods as warranted—and that under the language of its Subcontract, there is a disclaimer for consequential damages that result from its breach.[11] According to Scallon, paragraph 24 of the Subcontract disclaims consequential damages in a provision that it claims "broadly and unambiguously negates any liability by either party for all indirect damages." Since "personal injury damages for breach of contract are 'consequential', not 'direct', damages, Scallon concludes they are therefore not recoverable because they "fall within the liability disclaimer for consequential damages." Scallon further argues that the Warranty and Guarantee provision of the Subcontract limits the available remedy to repair or replacement.

S&B's Response to Scallon's MSJ

S&B filed a response to Scallon's MSJ based on the *Ethyl* express negligence doctrine, and S&B argues that the Terms and Conditions of the Purchase Order

---

[11] Citing Tex. Bus. & Com. Code Ann. §§ 2.714(b), 2.715(b).

18

included warranty and indemnity provisions under which "Scallon agreed to indemnify S&B and its client, Sunoco, for losses and damages incurred by them as a result of Scallon's negligence and fault." According to S&B, the Terms and Conditions did not contain a provision regarding consequential damages.

S&B maintains that it entered into a separate Subcontract with Scallon on or about October 1, 2013, under which Scallon agreed to provide PLC Technical Services. The Subcontract states it is for "services [] for equipment purchased on S&B Purchase order number C1505-I0050." The Subcontract includes a "Warranty and Guarantee" provision, requiring Subcontractor's (Scallon's) materials and work to conform to Contractor's (S&B's) specifications. The Subcontract also includes a provision requiring that Subcontractor make no changes to the work without Contractor's specific prior written approval. According to S&B, the Subcontract also requires Scallon to indemnify and hold S&B harmless from any and all loss or damage incurred by S&B as a consequence of Scallon's negligence.

S&B argues that Paul Dougharty instructed Scallon that the Fire Suppression System should be configured as non-fail-safe or de-energized. Dougharty testified that he gave this instruction, and that this specification was provided to Scallon in the "CB&I documents[,]"[12] although Dougharty could not recall when such documents were provided to Scallon. However, in an investigation after the incident,

---

[12] The "CB&I documents" are not in our appellate record.

19

S&B determined that Scallon had programmed inputs as fail-safe. And Scallon's Vice President of Systems, Peter Mondello, testified in his deposition that Chris Lampman, a systems engineer for Scallon, decided to configure the Fire Suppression System inputs as fail-safe. Mondello also testified in his deposition that Factory Acceptance Testing would not have revealed whether the inputs were configured as fail-safe or non-fail-safe.

S&B argues that there is no dispute that the inputs were configured as fail-safe, and this action was a change in the work without prior written authorization from S&B. Therefore, S&B argues that Scallon breached the parties' Subcontract. And S&B contends that it incurred damages as a consequence of the release of Purple K when the Fire Suppression System activated, including paying $2.2 million to settle with the Individual Plaintiffs, so S&B seeks indemnification from Scallon for *Scallon's* negligence and not for *S&B's* negligence, which means the express negligence rule does not apply.

S&B further argues that the Terms and Conditions applicable to the Purchase Order included an express warranty, and the Subcontract itself included a warranty. According to S&B, Scallon's argument that there is no express warranty because the parties' Subcontract was predominantly for "services" not covered by the UCC is "baseless" because the parties' agreements encompassed goods, such as hardware,

20

cabinets, and workstations. S&B also argues that, under Texas law, an implied warranty need not be for tangible goods to be enforceable.[13]

S&B further argues that because Scallon built and configured the Process Control System and Safety Control System pursuant to the Purchase Order, S&B is not precluded from seeking consequential damages because the Terms and Conditions that apply to the Purchase Order do not contain a contractual disclaimer of consequential damages. According to S&B, the consequential damages disclaimer in the Subcontract "has no bearing on the scope and effect of the indemnity provision found earlier in the Subcontract." S&B then argues that Scallon's argument regarding the distinction between consequential and direct damages only applies to damages proximately caused by breach of terms of the Subcontract and not the Purchase Order.

S&B attached to its response copies of the parties' Purchase Order, the Terms and Conditions to the Purchase Order, the Subcontract, selected pages from the transcript of Paul Dougharty's deposition, selected pages from the transcript of Chris Lampman's deposition, and selected pages from the transcript of Peter Mondello's deposition.

---

[13] Citing Tex. Bus. & Com. Code Ann. §§ 2.314, 2.315; *Nghiem v. Sajib*, 567 S.W.3d 718, 724-25 (Tex. 2019).

Sunoco also filed a response to Scallon's motion for summary judgment. Therein, Sunoco alleged that "Scallon supplied a defective electrical control product to Sunoco, leading to the Plaintiffs' injuries in this case for which Sunoco now seeks indemnification." Sunoco further alleged that the Purchase Order included a warranty provision that runs to its benefit as S&B's client, and it has an applicable indemnity provision. Sunoco also alleged that the Subcontract between S&B and Scallon also included warranty and indemnity provisions. Sunoco alleged that it filed its cross-claim against Scallon for breach of contract for failing to indemnify Sunoco against the Individual Plaintiffs' claims for breaching the specific and implied warranties in the Purchase Order and the Subcontract.

Sunoco argues that Scallon is just wrong about the application of the express negligence rule because it does not preclude Sunoco from recovering because Sunoco is seeking a recovery for Scallon's negligence and not for a recovery of damages caused by Sunoco's negligence. Sunoco also argues that the implied warranties under the UCC apply because the system Scallon sold to S&B and to Sunoco is a good, as defined under the UCC. According to Sunoco, Scallon's motion only addresses its Subcontract with S&B, and Scallon has failed to address the terms of the Purchase Order. And Sunoco argues that the services Scallon supplied were "incidental" to the goods for the PLC/Safety Control Services, which were valued

22

in excess of $1.3 million. Further, Sunoco maintains that, under the UCC, computer programming is embedded in computer hardware (or goods), so that the computer programming at issue in this case is a "good" and that the UCC's warranties apply.

In addition, Sunoco argues that the disclaimer of consequential damages in the Subcontract does not negate Scallon's liability because Sunoco's damages are direct. In support of this position, Sunoco points to the "liability and indemnity" provision of the Terms and Conditions attached to the Purchase Order, in which the seller is obligated to indemnify S&B and its clients from any and all loss, including bodily injury "resulting from or in connection with the execution of this Purchase Order to the extent of seller's negligence or willful misconduct." Sunoco contends that, Scallon maintains that Sunoco is limited to repair-and-replace remedies, but the parties did not expressly agree that these were the exclusive remedies, and the Purchase Order and Subcontract "specifically contemplate[] the damages sought in this case."

Scallon's Post-Hearing Brief in Support of its MSJ

In an additional brief filed after the hearing on Scallon's motion for summary judgment, Scallon argues, "Scallon was never sued by Plaintiff[s]. Plaintiff[s] only asserted allegations of negligence against S&B and Sunoco. S&B and Sunoco entered into a voluntary settlement with Plaintiffs. [] The only damages sought by S&B and Sunoco are the amounts paid by each to defend and resolve the underlying

23

litigation." Scallon also states that, although S&B's first third-party claim against Scallon asserted claims for negligence and contribution, the live pleading asserted claims only for breach of contract and warranty. Scallon also asserts that Sunoco had also "recast" its claims against Scallon for contribution, negligence, and indemnity as claims for breach of contract and warranty.

According to Scallon, S&B's and Sunoco's claims for contribution and indemnity are contingent on the Individual Plaintiffs' recovery of damages. Scallon argues that the Purchase Order and Subcontract in this case include no language providing that S&B and Sunoco with a right to settle claims brought against them and then seek reimbursement for what they paid in settlement from Scallon.[14] Scallon argues that by voluntarily settling with the Individual Plaintiffs, S&B and Sunoco "'have destroyed any forum for determining who was at fault.'"[15]

Scallon argues that the UCC provides only that the measure of direct damages for a breach of warranty claim is the difference between the value of the goods accepted and the value of the goods if they had been as warranted, but that S&B and

---

[14] Distinguishing *Air Liquide Am. Corp. v. Crain Bros., Inc.*, 11 F.Supp.2d 709 (S.D. Tex. 1997) (finding that the contract specifically provided that Air Liquide could settle claims against it and then seek indemnity from Crain, even absent a finding of fault by Crain).

[15] Quoting *MAN GHH Logistics GMBH v. Emscor, Inc.*, 858 S.W.2d 41 (Tex. App.—Houston [14th Dist.] 1993, no writ) (where co-defendants cross-claimed against one another for contribution after settling with plaintiffs, the defendants' contract provided for reciprocal indemnity obligations but not for contractual contribution to reimburse the other for any voluntary settlements with plaintiffs).

Sunoco are seeking "the damages that they paid to the Plaintiffs and defense costs []
as a result of a voluntary settlement[,]" which would not be recoverable under a
breach of warranty theory.

S&B's Response to Scallon's Post-Hearing Brief

Responding to Scallon, S&B alleged that Texas law recognizes claims for
reimbursement after settlement under a contractual indemnity provision and that
Scallon's position that S&B is recasting its contribution and indemnity claims as a
breach of warranty claim is "fallacious[.]" S&B further argues that, under Texas law,
a claimant may recover incidental and consequential damages for a breach of
warranty claim.[16]

Sunoco Nonsuit and Zurich Intervention

In a separate post-hearing brief, Sunoco adopted the arguments in S&B's post-
hearing brief. Sunoco subsequently non-suited all claims against Scallon, and the
trial court dismissed the Sunoco's claims without prejudice. The following day,
Zurich filed a petition in intervention, arguing that as Sunoco's subrogee, it was
entitled to recover the amount it paid to defend Sunoco and to settle the suit filed by
the Individual Plaintiffs against Sunoco, its insured. According to Zurich,

> Zurich, as a subrogated Intervenor, asserts that Defendant Scallon
> Control, Inc.'s breaches of contract to indemnify Sunoco, together with
> its breaches of warranty, express and implied, caused the accident and
> the incident which injured the workers who were plaintiffs in the

---

[16] Citing Tex. Bus. & Com. Code Ann. § 2.715.

25

Underlying Case, harm for which Zurich paid both to defend and resolve. . . . With respect to Scallon's contractual indemnity obligations, Zurich asserts that Scallon was negligent and the sole or dominant legal cause of the accident leading to the Underlying Case and expenses sought herein.

In a response that Zurich filed to Scallon's motion for summary judgment, Zurich adopted the responses Sunoco filed to Scallon's motion. In a separate Supplemental Brief, Zurich adopted S&B's arguments and argued that after a settlement, a contractual indemnity agreement may be enforced.

Scallon's MSJ Against Zurich

Scallon also filed a motion for summary judgment on Zurich's claims. Attached to that motion are copies of the confidential settlement agreements with the seven Individual Plaintiffs, executed in June of 2019. In the settlement agreements, the Individual Plaintiffs agreed to fully release and discharge their claims against Defendants. In another of the provisions in the settlement agreement, S&B and Sunoco fully released and discharged each other from any and all claims.

Scallon argues there is an "insurmountable problem for [Zurich] that it filed its intervention one day after Sunoco's nonsuit was granted *and* 6 years, 11 months and 4 days after the underlying loss *and* there is an absolute 4 year statute of limitations applicable to UCC warranty claims[]." According to Scallon, Zurich seeks to "spin an express or implied warranty claim into a right of full tort indemnity[.]" Scallon again argues that neither the Purchase Order (and its Terms

26

and Conditions) nor the Subcontract meet the express negligence test. Scallon explains that the indemnity language in the Purchase Order is limited to indemnification for "Seller's allocable share of comparative[] negligence[,]" so that Scallon is not obligated to indemnify Zurich nor S&B for Sunoco's nor S&B's negligence. Applying the express negligence rule, Scallon argues that Zurich may not recover the "settlement dollars and defense dollars" which it claims. In addition, Scallon argues that Zurich and S&B, as settling tortfeasors, have no right to post-settlement contribution.[17] Due to the settlement and subsequent dismissal of the Individual Plaintiffs' claims against S&B and Sunoco, there is no evidence that, in settling, S&B paid more than its percentage of liability, and Zurich may not seek indemnity for the costs of defending Sunoco.

Scallon also argues that implied warranties under the UCC are subject to a four-year statute of limitations, the statute of limitations on Zurich's intervention began to run on the date of the underlying loss, and Zurich's intervention is too late. In this case, Scallon states, "all [seven] settling plaintiffs dismissed their claims against [S&B and Sunoco] at a time when no plaintiff was claiming against Scallon *and* Scallon was before the Court as a third-party defendant[.]" In addition, the

---

[17] Citing *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 21 (Tex. 1987) (The Court held that defendants who settled the plaintiff's entire claim could not preserve the right to contribution from an alleged joint tortfeasor who did not participate in the settlement and stated, "An agreed judgment incorporating a settlement does not provide a basis for subsequent contribution claims.").

discovery rule cannot save Zurich because the rule does not apply to UCC breach of implied warranty claims.[18] Further, the discovery rule does not apply where a claimant knows it has sustained a loss, as here, when the Individual Plaintiffs sued in August of 2016 for injuries allegedly sustained in January of 2015. Scallon also cites to other cases holding that a warranty to perform in a good and workmanlike manner may not be used to seek indemnity for negligent injuries to third parties.[19]

Zurich's Response to Scallon and Its First Amended Petition in Intervention

After Scallon filed its MSJ against Zurich, Zurich filed a First Amended Petition in Intervention claiming that, as subrogee or assignee to Sunoco's rights, it is either a direct or a third-party beneficiary under the Purchase Order and Subcontract between Scallon and S&B and that its rights to indemnification derive from these agreements. Zurich states that its claim for damages is based on Scallon's breach of its contractual obligation to indemnify Zurich, as Sunoco's subrogee, for damages caused by Scallon's negligent acts or omissions. Zurich specifically denies that the negligence of any party other than Scallon caused the mistake in the design of the system inputs that resulted in the release of Purple K fire suppressant. And

---

[18] Citing *PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79 (Tex. 2004) (holding that the UCC requires suit on a breach of warranty claim within four years of delivery unless the warranty explicitly guarantees performance beyond four years).

[19] Citing *Haring v. Bay Rock Corp.*, 773 S.W.2d 676, 680 (Tex. App.—San Antonio 1989, no writ); *Exxon Corp. v. Roberts*, 724 S.W.2d 863, 871 (Tex. App.—Texarkana 1986, writ ref'd n.r.e.).

Zurich alleges that Scallon's breaches of contract in failing to indemnify Sunoco and Zurich are the cause of the expenses and damages for which it seeks recovery.

In Zurich's First Amended Petition in Intervention, Zurich alleges Scallon was negligent as follows: (1) Scallon failed to investigate and obtain the information necessary to design the circuit in a way that would avoid a discharge due to a brief power outage; (2) Scallon failed to anticipate and plan for the effect of a power outage; and (3) it failed to assign adequately trained personnel and supervision to the project.

In Zurich's Response to Scallon's motion for summary judgment against it, Zurich argues that the express negligence rule does not apply because Zurich is not seeking indemnity for Sunoco's negligence but for Scallon's negligence. Zurich also argues that Scallon's reliance on *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19 (Tex. 1987), is misplaced because *Beech* only addresses contribution for tort liability and not contractual indemnity. Zurich further asserts that a claim for contractual indemnity from a third party does not ripen until the underlying case is resolved and the indemnitee's liability becomes fixed and certain.[20] Zurich's response also incorporates all prior responses by S&B and Sunoco.

---

[20] Citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 134 (Tex. 2010).

On January 27, 2022, the trial court granted Scallon's motion for summary judgment and denied S&B's motion for partial summary judgment. The Order expressly stated that it was interlocutory because it did not address Zurich's intervention. On July 15, 2022, the trial court granted Scallon's motion for summary judgment against Zurich.

On August 17, 2022, the trial court entered a Final Judgment, stating in relevant part:

> [I]t is now ORDERED, ADJUDGED AND DECREED that:
> 1. S&B Engineers and Constructors LTD and Zurich American Insurance Company take nothing by reason of their suits against Scallon Controls, Inc.
> 2. All costs of court incurred herein are hereby ordered taxed against S&B Engineers and Constructors LTD.
> 3. This judgment disposes of all issues and parties now before the Court.
> 4. All relief not expressly granted is denied.
> 5. This Judg[]ment is Final.

Then on September 21, 2022, the trial court signed a nunc pro tunc order confirming that the July 15, 2022 order "was intended to be and is a full and final disposition of all claims by all parties[.]" S&B and Zurich timely filed their Notices of Appeal.

Issues

Appellant S&B raises four issues on appeal. In its first issue, S&B argues that the trial court erred in ordering summary judgment for Scallon because the Purchase Order was for the sale of goods—namely software programming and system

30

integration—that caused the accident. S&B argues that the Purchase Order included an express warranty that the goods were fit for their specified purpose, an enforceable promise of indemnification for personal injury, and did not include a disclaimer of liability for consequential damages.

In its second issue, S&B argues that the trial court erred if it granted summary judgment for Scallon due to a lack of evidence that Scallon's breach of express or implied warranties caused the personal injuries for which S&B paid a settlement to the Individual Plaintiffs.

In its third issue, S&B argues that the trial court erred in granting summary judgment for Scallon based on the express negligence rule because that rule does not apply to Scallon's obligations under the Terms and Conditions of the Purchase Order, and because the Terms and Conditions obligate Scallon to indemnify S&B for Scallon's own fault.

In its fourth issue, S&B argues that the trial court erred by granting summary judgment for Scallon because S&B's right to contractual indemnity is "by definition" not tort contribution and can be enforced after a settlement.

Appellant Zurich raises two issues in its brief. In its first issue, Zurich argues that the trial court erred by granting summary judgment in favor of Scallon based on the express negligence rule because that rule does not void Scallon's contractual obligations.

In its second issue, Zurich argues that the trial court erred by granting summary judgment for Scallon if it did so based on Scallon's argument that Zurich's claim is not a contractual indemnity claim but rather a claim for contribution under tort law.

### Standard of Review

We review grants of summary judgment de novo. *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 72 (Tex. 2023); *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). In our review we take as true all evidence favorable to the non-movant, indulging every reasonable inference in favor of the non-movant, and resolving any doubts in the non-movant's favor. *See Helena Chem. Co.*, 664 S.W.3d at 73; *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

To defeat a no-evidence motion, the non-movant must produce evidence raising a genuine issue of material fact as to the challenged elements. *See* Tex. R. Civ. P. 166a(i) (stating that the trial court must grant a no-evidence motion for summary judgment "unless the respondent produces summary judgment evidence raising a genuine issue of material fact[]"); *Helena Chem. Co.*, 664 S.W.3d at 72. A genuine issue of material fact exists if the evidence "'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

The evidence does not create an issue of material fact if it is "'so weak as to do no more than create a mere surmise or suspicion'" that the fact exists. *Id.* (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014)). "Both direct and circumstantial evidence may be used to establish any material fact." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

A party moving for a traditional summary judgment must establish that no genuine issue of material fact exists, and it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). If the moving party produces evidence entitling it to a summary judgment, the burden shifts to the nonmovant to present evidence that raises a fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). In determining whether there is a disputed fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). We review the summary judgment record in the light most favorable to the non-movant, "indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

When the parties cross move for summary judgment and the trial court grants one motion and denies the other, we consider both sides' summary judgment evidence, determine all questions presented, and render the judgment the trial court

33

should have rendered. *Concho Res., Inc. v. Ellison*, 627 S.W.3d 226, 233 (Tex. 2021) (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010)).

Zurich's Claims

We examine Zurich's subrogation claims first. Zurich contends it has rights as Sunoco's subrogee. Zurich filed its original Petition in Intervention on December 10, 2021—almost 6 years after the incident and almost 5 years after the Individual Plaintiffs filed their Original Petition. Zurich did not intervene until after Sunoco had already settled with the Individual Plaintiffs and after Sunoco nonsuited all of its counter and crossclaims against all other parties.

Generally, subrogation actions are subject to the same defenses, including limitations, that would apply if the action had been brought by the subrogor. *Guillot v. Hix*, 838 S.W.2d 230, 232 (Tex. 1992); *PNC Mortg. v. Howard*, 651 S.W.3d 154, 157 (Tex. App.—Dallas 2021), *aff'd*, 668 S.W.3d 644 (Tex. 2023). Therefore, Zurich's claims for breach of contract, whether in common law or under the UCC, are still subject to a four-year statute of limitations. *See PPG Inds., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 92 (Tex. 2004) ("The UCC generally requires suit on breach of warranty claims within four years of delivery, regardless of when the buyer discovers defects in the goods.") (citing Tex. Bus. & Com. Code Ann. § 2.725(a), (b)); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002) (explaining

34

that a four-year statute of limitations applies to claims for breach of contract) (citing Tex. Civ. Prac. & Rem. Code Ann. § 16.051)). Because Zurich filed its Petition in Intervention outside the applicable limitations period, the trial court could have based its summary judgment on the conclusion that the intervention seeking subrogation was wholly barred by limitations. We agree and we overrule both of Zurich's issues on appeal.

S&B's Issues on Appeal

S&B's petition alleges two breaches of contract by Scallon: (1) a breach of the "Changes" provision of the Purchase Order and the Subcontract by making changes to the work as instructed by S&B without obtaining prior written approval, and (2) a breach of the contractual obligation to indemnify S&B. We first examine the indemnification issue.

<u>S&B's Claim for Breach of Contract for Alleged Failure to Indemnify</u>

Both the Subcontract and the Purchase Order include indemnification provisions. Paragraph 9 of the Subcontract, titled "Liability Indemnity[,]" provides, in relevant part,

> SUBCONTRACTOR SHALL DEFEND, INDEMNIFY AND SAVE HARMLESS THE CONTRACTOR AND OWNER AND THEIR PARENTS AND AFFILIATED COMPANIES ("INDEMNITEES") FROM AND AGAINST ANY AND ALL LOSS, DAMAGE, INJURY, LIABILITY, AND CLAIMS THEREOF FOR INJURY TO OR DEATH OF ANY PERSON (INCLUDING AN EMPLOYEE OR SUBCONTRACTOR OF AN INDEMNITEE) OR FOR LOSS OF OR DAMAGE TO PROPERTY (INCLUDING THE

35

PROPERTY OF INDEMNITEES) OR FOR LOSS OR DAMAGE ARISING FROM ATTACHMENTS, LIENS OR CLAIMS OF MATERIALMEN OR LABORERS TO THE EXTENT CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF SUBCONTRACTOR. CONTRACTOR SHALL DEFEND, INDEMNIFY AND SAVE HARMLESS THE SUBCONTRACTOR FROM AND AGAINST ANY AND ALL LOSS, DAMAGE, INJURY, LIABILITY, AND CLAIMS TO THE EXTENT CAUSED BY CONTRACTOR. THIS INDEMNITY SHALL NOT APPLY TO THE EXTENT THAT SUCH INDEMNIFICATION IS VOID OR OTHERWISE UNENFORCEABLE UNDER APPLICABLE LAW IN EFFECT ON OR VALIDLY RETROACTIVE TO THE DATE OF THIS AGREEMENT. . . .

Paragraph 12 of the Terms and Conditions of the Purchase Order, titled "Liability

and Indemnity[,]" provides, in relevant part,

**OTHER CLAIMS.** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, SELLER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS S&B, AND ITS AFFILIATED COMPANIES, SUBSIDIARIES AND CLIENTS FROM AND AGAINST ANY AND ALL LOSS, DAMAGE, CLAIM, SUIT, LIABILITY, STRICT LIABILITY, PRODUCT LIABILITY, JUDGMENT AND EXPENSE (INCLUDING ATTORNEY'S FEES AND OTHER COSTS OF LITIGATION) AND ANY FINES, PENALTIES AND ASSESSMENTS, ARISING OUT OF (A) DAMAGE TO OR LOSS OF PROPERTY OR (B) BODILY INJURY, DISEASE OR DEATH TO PERSONS OTHER THAN EMPLOYEES OF SELLER, ITS AGENTS OR SUBCONTRACTORS RESULTING FROM OR IN CONNECTION WITH THE EXECUTION OF THIS PURCHASE ORDER TO THE EXTENT OF SELLER'S NEGLIGENCE OR WILLFUL MISCONDUCT. IN CASE OF COMPARATIVE, CONCURRENT AND/OR CONTRIBUTING NEGLIGENCE, FAULT OR STRICT LIABILITY OF SELLER OR BUYER, WHETHER THROUGH ITS EMPLOYEES AND/OR REPRESENTATIVES, SELLER'S DUTY TO INDEMNIFY AND HOLD HARMLESS REFERRED TO IN THE PREVIOUS SENTENCE SHALL BE SELLER'S ALLOCABLE SHARE OF

36

COMPARATIVE, CONCURRENT AND/OR CONTRIBUTING NEGLIGENCE, FAULT OR STRICT LIABILITY.

In Scallon's motions for summary judgment, Scallon argued that the express negligence rule precludes S&B from seeking indemnification from Scallon for S&B's own negligence. Under the express negligence rule, "parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms [] within the four corners of the contract." *Ethyl Corp.*, 725 S.W.2d at 708; *see also Fisk Elec. Co. v. Constructors & Assocs.*, 888 S.W.2d 813, 813-14 (Tex. 1994); *SpawGlass, Inc. v. E.T. Servs., Inc.*, 143 S.W.3d 897, 899 (Tex. App.—Beaumont 2004, pet. denied) (per curiam) ("The express negligence rule requires that the intent of the party seeking indemnity from the consequences of that party's own future negligence must be expressed in unambiguous terms within the four corners of the contract."). The rule is one of contract construction or interpretation. *See Fisk*, 888 S.W.2d at 814.

In *Fisk*, Fisk Electric Company ("Fisk") entered into a contract with Constructors & Associates ("Constructors"). *Id.* One of Fisk's employees was injured on the job, and the employee sued Constructors for negligence. *Id.* Constructors then brought a third-party action against Fisk seeking indemnification. *Id.* The contract between Fisk and Constructors provided, "to the fullest extent permitted by law, [Fisk] shall indemnify, hold harmless, and defend [Constructors] . . . from and against all claims, damages, losses, and expenses" arising out of or

37

resulting from the performance of Fisk's work. *Id.* Applying *Ethyl*, the Texas Supreme Court held Fisk had no obligation to indemnify Constructors under the parties' contract because the claim against Constructors was for Constructors' own negligence and because the parties' contract did not meet the requirements of the express negligence rule. *Id.*

Many Texas courts, including our Court, have discussed the application of the express negligence doctrine. For example, in *Faulk Management Services v. Lufkin Industries, Inc.*, 905 S.W.2d 476, 478 (Tex. App.—Beaumont 1995, writ denied), Faulk Management Services ("Faulk") provided janitorial services to Lufkin Industries ("Lufkin") under a written agreement between the parties which contained an indemnity provision. *Id.* at 477. Harrison, one of Faulk's employees, was injured while working at Lufkin. *Id.* Harrison sued Lufkin for negligence, alleging that Lufkin failed to provide a safe place to work or failed to warn of hidden dangers. *Id.* Lufkin demanded indemnity and defense from Faulk based on its contract with Faulk. *Id.* at 477-48. The trial court granted summary judgment in favor of Lufkin. *Id.* at 477. On appeal, this Court affirmed the trial court's judgment because the parties' contract expressly provided, in relevant part,

> It is the intention of the Seller and/or Contractor to indemnify Lufkin Industries, Inc. even in the event that any such claims, demands, actions or liability arises in whole or in part from warranties, express or implied, defects in materials, workmanship or design, condition of property or its premises and/or negligence of Lufkin Industries, Inc. or any other fault claims as a basis of liability for Lufkin Industries, Inc.

38

*Id.* at 478. This Court held that the contract met the express negligence test because it did not limit indemnification to claims caused by Faulk and provided for indemnity arising out of performance of the contract, even if wholly caused by Lufkin's negligence. *Id.*; *see also SpawGlass, Inc.*, 143 S.W.3d at 900-01 (holding that the parties' agreement expressly provided that the subcontractor indemnify the contractor for the consequences of contractor's own negligence).

In the agreements at issue here, unlike the language at issue in *Faulk*, here the indemnity language fails to specify that Scallon will indemnify S&B for S&B's own negligence and it is more like the language in *Gilbane Building Co. v. Keystone Structural Concrete, Ltd.*, 263 S.W.3d 291 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In *Gilbane*, Gilbane Building Co. ("Gilbane"), a general contractor, executed a subcontract with Keystone Structural Concrete, Ltd. ("Keystone") for work at Rice University. *Id.* at 294. One of Keystone's employees was injured during construction, and the employee sued Gilbane for negligence. *Id.* The employee settled with Gilbane, and Gilbane's insurers paid the settlement. *Id.* Then Gilbane sued Keystone and its insurer seeking to recover the amounts Gilbane paid to settle the employee's claim. *Id.* The appellate court affirmed the summary judgment on Gilbane's claim for contractual indemnity because "the contractual indemnity provision [was] not enforceable because Gilbane was sued for its own negligence, the indemnity provision [did] not expressly indemnify Gilbane for its own

negligence, and therefore, it [did] not comply with the express negligence test mandated by Texas law." *Id.* at 296. The Court further stated, "only Gilbane was sued for negligence; Keystone was not sued." *Id.* at 297. As stated by the *Gilbane* court, the policy underlying the express negligence rule is to prevent post-settlement "satellite litigation" about who caused the plaintiff's injury. *Id.* at 298.

Here, S&B and Sunoco were sued for negligence, and the Individual Plaintiffs made no claim against Scallon. S&B and Sunoco settled with the Individual Plaintiffs, and then sought indemnification under the contract (either the Subcontract and Purchase Order, or both) for the amounts they paid to settle. However, in this case, the indemnification provisions of both the Subcontract and the Purchase Order only require Scallon to indemnify S&B (and its clients) for Scallon's negligence and not for S&B's own negligence. We conclude that S&B's claim against Scallon for indemnification is barred by the express negligence rule. *See Fisk*, 888 S.W.2d at 814; *Ethyl Corp.*, 725 S.W.2d at 708; *Faulk Mgmt. Servs.*, 905 S.W.2d at 478. As in *Gilbane*, S&B and Sunoco were sued for their own negligence. Scallon was not sued by the Individual Plaintiffs. S&B may not seek indemnification from Scallon where S&B settled the Individual Plaintiffs' claims against S&B for negligence, and the Individual Plaintiffs did not state a claim for negligence against Scallon, and where the contracts between S&B and Scallon did not expressly provide that Scallon was obligated to indemnify S&B for S&B's own negligence. *See Gilbane*, 263 S.W.3d

40

at 296-97. And we agree with *Gilbane* that the application of the express negligence rule prevents post-settlement "satellite litigation" about who caused the Individual Plaintiffs' injuries. *Id.* at 298.

Although S&B maintains that its claim for contractual indemnity is not one for contribution, we also note the record provides no basis for S&B to seek *contribution* against Scallon. Although the terms "contribution" and "indemnity" may be used interchangeably, they do not mean the same thing. "Contribution" refers to the payment by each tortfeasor of its proportionate share of the plaintiff's damages. *See* Gus M. Hodges, Contribution and Indemnity Among Tortfeasors, 26 Tex. L. Rev. 150, 150 (1947). By contrast, indemnity refers to the "shifting [of] the entire burden of loss from one tortfeasor to another." *B & B Auto Supply, Sand Pit & Trucking Co. v. Cent. Freight Lines, Inc.*, 603 S.W.2d 814, 816 (Tex. 1980). The Texas Supreme Court has explained that "[t]he essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability. An agreed judgment incorporating a settlement does not provide a basis for subsequent contribution claims." *Beech Aircraft Corp.*, 739 S.W.2d at 21. The appellate record in this case does not include a judgment finding Scallon to be a joint tortfeasor with S&B. *See* Tex. Civ. Prac. & Rem. Code Ann. § 32.002 (Recovery for contribution is only available against a "codefendant against whom judgment is also

41

rendered."). Therefore, the record provides no basis for S&B to claim contribution against Scallon. *See id.*; *Beech Aircraft Corp.*, 739 S.W.2d at 21.

<u>S&B's Claims for Breach of Contract and Breach of Warranty</u>

Appellants do not argue in their appellate briefs that the trial court erred in granting summary judgment for Scallon on S&B's claim for breach of contract or breach of warranty claims based on Scallon's alleged failure to obtain prior written approval for changes in the work or for failing to design and install a non-fail-safe system. However, in one statement in their appellate brief, S&B does state that breach of warranty is a type of "fault" that would trigger Scallon's contractual duty to indemnify S&B. That said, Appellants' briefs do not include a "succinct, clear, and accurate statement" of any argument supported by relevant authority and citations to the record that the trial court erred in granting summary judgment for Scallon on S&B's claim for breach of contract or breach of warranty claims based on Scallon's alleged failure to obtain prior written approval for changes in the work or for failing to design and install a non-fail-safe system. *See* Tex. R. App. P. 38.1(h), (i). Additionally, Appellants have failed to identify evidence of damages incurred due to any such alleged breach, and under the UCC, the remedy for breach for non-conforming goods is the "difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted[.]" *See* Tex. Bus. & Com. Code Ann. § 2.714(b).

42

Conclusion

To summarize, we conclude that the trial court did not err in granting summary judgment in favor of Scallon on S&B's and Zurich's claims for indemnity, for breach of contract, and breach of warranty. We overrule S&B's and Zurich's issues, and we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on September 18, 2023
Opinion Delivered May 23, 2024

Before Golemon, C.J., Johnson and Wright, JJ.